# EXHIBIT A

# AFFIDAVIT OF TRACI L. JONES

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TRACI L. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. : CV-08-BE-1599-S |
| | ) |
| FREEDOM RAIN, TLC | ) |
| d/b/a THE LOVELADY CENTER, | ) |
| | ) |
| and BRENDA SPAHN, | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF TRACI L. JONES

BEFORE ME, THE UNDERSIGNED Notary Public, in and for said State and in said County, personally appeared Traci L. Jones, who being known to me, upon oath duly administered deposed and said as follows:

1. My name is Traci L. Jones. I am over nineteen years of age and I have personal knowledge of the facts set forth herein.

2. Defendant Freedom Rain, TLC is also called Freedom Rain Ministries, The Lovelady Center and TLC, but all are the same, so I refer to them all as "Defendant TLC" or just "TLC" in this affidavit.

1

3. Pay checks I received when I worked at TLC indicated my employer was called "Freedom Rain, TLC."

4. I and employees of TLC also referred to the building or facility where TLC was located as The Lovelady Center or also just as TLC.

5. In addition to being the Executive Director of TLC, I have heard Defendant Brenda Spahn call herself the owner of TLC.

6. I started working for the Defendants about June 2006 and worked at TLC until about August 2007.

7. I regularly worked Monday through Friday for the Defendants.

8. I began work on regular workdays between 7:30 am and 8:00 am, and I often worked until between 6:00 pm and 6:30 pm, but at least until 5:00 pm on these days.

9. I was also required to work at least one weekend a month at TLC.

10. A weekend consisted of forty-eight (48) hours straight beginning Friday at 5:00 pm until Sunday at 5:00 pm.

11. My straight time wage rate started out at $9.00 per hour and later I received a raise to $10.00 per hour.

12. I was only paid an additional $200.00 for working a forty-eight (48) hour weekend at TLC.

13. I often did not receive my paychecks from the Defendants on time.

14. I was seldom allowed to take a lunch break while at work and would have to eat at my desk, and I was not compensated for this.

15. At least once a month I was required to attend a one hour prayer vigil at TLC, and I was not paid for the hour spent at the mandatory prayer vigil.

16. I was reprimanded by Spahn if I did not attend the required prayer vigil.

17. I was not paid time and a half for all hours worked in excess of 40 hours per week that I worked for the Defendants.

18. Around December 2006 in a staff meeting, Spahn told me and several other client representatives in attendance that we were not to work more than forty-five (45) hours per week, and that when tax time comes she was only reporting that we worked forty (40) hours per week.

19. Spahn knew at the time she said the above that were required to also work a weekend a month, which alone added forty-eight (48) hours to our time, causing us to have more than forty five (45) hours per week.

20. Sometimes I worked two weekends a month.

21. Some of the employees working for TLC like myself left because they were not getting paid what they were due.

22. I complained to the Defendant Spahn and her daughter, Melinda Megahee,

that I was not being compensated for the overtime hours that I worked.

23. I did not have the authority to hire or fire fellow employees.

24. The first time I went to TLC was because I worked for a non-profit organization called Sex And Family Education "SAFE". SAFE's mission is to teach abstinence until marriage. I was originally sent by SAFE to TLC to teach classes around June 2006. Within two weeks after arriving at TLC to teach I was approached by Spahn who asked me to come to her office. Spahn asked me what it would take to get me to work at TLC. I was happy with my job with SAFE, but Spahn made me an offer I could not refuse. Unfortunately most of the things Spahn promised me were not true. Spahn promised to give me a good raise shortly after I started, and Spahn promised to provide me insurance. The insurance was the main thing that enticed me to leave my job with SAFE because I really needed insurance. I was only provided insurance for a few months then it was canceled, and I also did not receive all the raises I was promised. It was Spahn who made the decision to hire me. Spahn offered me a job as a client representative, and I accepted it.

25. In January 2007, Spahn told me she was taking away my insurance because she could not afford it right now and I would get it back in May 2007 because Spahn was expecting some money, but I never got it back.

26. There are other drug rehab centers for women and their children in the

Birmingham area. Two are Olivia House and Aletheia House. Both of these facilities like TLC accept women from prison.

27. Both Olivia House and Aletheia House allow children to be with their mothers.

28. Both Olivia House and Aletheia House do not require their clients to pay fees.

29. The organizational structure depicted on Exhibit A to MeGahee's Affidavit (DOC0048) is not the chain of command followed in the day to day operation of TLC. Spahn is very involved in the day to day operations of TLC, and if I or any other client representative had a problem, question, or concern we would go see Spahn directly. The times I went to the Program Director we would have to go see Spahn to get the issue resolved.

30. Spahn was my direct supervisor. She personally gave me orders every day. About once a week, and sometimes more, Spahn would make an announcement over the intercom that there would be a client representative meeting in her office. In these meetings Spahn would go over what the client representatives should be doing, and anything she wanted us to do different. Spahn would also tell us whether or not we were going to get paid that week, or not, based on the alleged financial situation. Also in these meetings Spahn would give us a list of clients who were behind on their rent (program fees), and tell us which clients were not allowed passes to leave the center because they were behind. Spahn would also tell us which clients were going to be kicked out of TLC

because they were too behind on their fees, and these clients were kicked out if they did not pay. Also Spahn would talk about ways to get more money for TLC. Whenever I tried to talk to MeGahee about getting my insurance back or if a client had a special need, MeGahee would walk me to Spahn's office to get the issue resolved.

31. Spahn is also the one who would reprimand or discipline a client representative if needed.

32. It was one of my job duties to ensure my clients were in attendance at the morning meditations, and if not I had to find out why and make a note in their file.

33. I was aware of at least one client who never attended any classes while at TLC. I knew the client had not attended any classes because her file did not contain any certificates. Whenever a client completed a class they received a certificate. The client told me she had not attended any classes because she had been working for Spahn's husband, Jeff Spahn, painting houses the entire time she was at TLC. I also saw at least one client who was allowed to print her own certificates for classes she never attended. This client also printed certificates for other women who had not attended the classes. Sometimes clients do not go to all the classes they need to because they are too busy working in order to pay their rent (program fees) at TLC. If a client does not have a job within the first thirty days of entering TLC then she is pressured to find one and the center will find her one unless she has someone who is paying her rent (program fees) for

6

her.

34. I heard Spahn tell Andrew Jenkins, who was the program director at that time, that it was not working that the girls were not paying for the first 30 days while they were in the program.

35. When I worked at TLC its clients had to pay $250.00 for the first thirty days at TLC and then $100.00 per week thereafter for rent, and also $20.00 or $30.00 a week for transportation from TLC.

36. If they could not pay the above, the clients would have to sign a paper saying they would get a job and later pay the above amounts to TLC out of their paycheck.

37. The clients had to get jobs in order to pay their TLC program fees.

38. TLC has a personnel service where TLC finds its clients a job in the community and TLC takes a portion of their pay in return.

39. Many clients worked for Jeff Spahn, Brenda's son, Beau Gregory, and Brenda's daughter in law, Kim Gregory. Jeff and Beau had real estate businesses and used TLC clients to clean up properties unrelated to TLC. Clients who worked for them received a reduction in their fees to TLC.

40. Spahn set up an internal food stamp program where clients applied for food stamps at TLC and TLC would receive funds from the State.

41. When a client was received at TLC, the client was required by Spahn to fill out an

application for food stamps. Any client who refused to apply for food stamps was told by Spahn to leave TLC. Clients were forced to leave when they refused to apply for food stamps.

42. Food is provided to TLC clients however the food sold from the TLC diner is of higher quality, and therefore some clients, who can afford to do so, purchase food from the TLC diner.

43. Spahn and her children, Miranda and Christian Williamson, and Melinda Megahee received free meals from the TLC diner.

44. Spahn and some of her children had family cars which were listed for accounting purposes as TLC assets.

45. The clients had to get jobs in order to pay their TLC fees.

46. When I worked at TLC about 65% on average of TLC's clients worked outside TLC in the community, and about 20% worked in the center, and about 15% did not work at all because they were on social security or disability, or were new to the center.

47. TLC had several businesses such as the Daycare (Kid Zone), Beauty Shop, Flea Market, Diner (The Lovelady Diner), and TLC Personnel and these businesses were all located in the TLC building.

48. During my employment at TLC there were up to 300 clients at the center.

49. Once a client had a job it was one of my responsibilities as a client representative

to ensure the client had transportation to and from that job, and in some cases I would use my personal vehicle to carry the client to and from the job or to fill out job applications.

50. Many times I used my personal vehicle to provide transportation for my clients, which included but was not limited to taking them to work, doctor's appointments, court hearings, and various stores in order for the clients to purchase items they needed.

51. On Saturdays TLC provided transportation for the clients to go to Wal-mart, but if a client had to work Saturday I would take them to Wal-mart or another store so they could get what they needed.

52. As a client representative, it was also my responsibility to ensure the clients had the things they needed for them to be able to go to work, or court, or whatever. This would include taking the clients to stores in order for the clients to buy items they needed, which included clothes, medicine, and personal hygiene items.

53. If a client had a court hearing it had to be arranged through Spahn in order for me to take them.

54. I would check on my client's children in TLC's daycare for them while they were at work, and play with them and make sure they were being taken care of.

55. I never saw Spahn leave her car at TLC overnight, and I would see her arrive in the morning at TLC in it.

56. Spahn's son-in-law, Shawn Megahee, who is a tax consultant, was allowed to

come inside the center and offer his services to TLC clients for a fee, and several of the clients used his service to prepare their tax returns.

57. Clients came to me and complained that Spahn had berated them if she found out they had used someone other than her son-in-law to prepare their tax returns.

58. If I worked a weekend I had to attend TLC's church service and was not allowed to go to my church for services. It was mandatory I attend TLC's services per Spahn, and if I did not attend then I feared I would be fired.

59. Before clients could get a weekend pass to leave the center they were charged $10.00 each time for a drug test which was to be administered by TLC upon their return. I am aware of several occasions where women who had paid for a drug test did not receive one, and they were not given back the money they had paid TLC for it or given credit against the cost of a future drug test.

_____
Traci L. Jones

STATE OF ALABAMA)

JEFFERSON COUNTY)

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Traci Jones, who is known to me and who, being by me first duly sworn, deposes and says that she has read the foregoing, that the statements

contained therein are true and correct, and that she executes said foregoing voluntarily and of her own free will.

Witness my hand this 27th day of August, 2009.

_____
Notary Public
My commission expires: 5/22/2011

11