FILED

2009 Aug-31  PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT C

# BRENDA SPAHN'S DEPOSITION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


| | |
|---|---|
| TRACI L. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CV-02-HGD-3112-M |
| | ) |
| FREEDOM RAIN, TLC | ) |
| d/b/a THE LOVELADY | ) |
| CENTER, and BRENDA | ) |
| SPAHN, | ) |
| | ) |
| Defendant. | ) |

_____

DEPOSITION OF BRENDA LOVELADY SPAHN
10:15 A.M.
APRIL 10, 2009

_____

Page 2

1     STIPULATIONS
2         IT IS STIPULATED AND AGREED by and
3     between the parties through their respective
4     counsel that the deposition of BRENDA
5     LOVELADY SPAHN, a witness in the
6     above-entitled cause, may be taken before
7     Deborah K. Munago, a Notary Public for the
8     State of Alabama, at 2015 1st Avenue North,
9     Birmingham, on the 10th day of
10    April, 2009, commencing at 10:15 a.m.,
11    pursuant to the Federal Rules of Civil
12    Procedure.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16    that the signature to and the reading of the
17    deposition by the witness is waived, the
18    deposition to have the same force and effect
19    as if full compliance had been had with all
20    laws and rules of court relating to the
21    taking of the depositions.
22
23

Page 3

1
2
3         STIPULATIONS (continued)
4
5
6
7         IT IS FURTHER STIPULATED AND AGREED
8     that it shall not be necessary for any
9     objections to be made by counsel to any
10    questions except as to form or leading
11    questions, and that counsel for the parties
12    may make objections and assign grounds at the
13    time of trial or at the time said deposition
14    is offered in evidence or prior thereto.
15
16
17
18
19
20
21
22
23

Page 4

1         A P P E A R A N C E S
2
3     For The Plaintiff:
4         Thomas F. Talty
5         ATTORNEY AT LAW
6         2015 1st Avenue North
7         Birmingham, Alabama 35203
8         Taltylaw@bellsouth.net
9
10    For The Defendant:
11        David R. Donaldson
12        DONALDSON & GUIN, LLC
13        505 20th Street North, Suite 1000
14        Birmingham, Alabama 35203
15
16    Reported by:
17        Deborah K. Munago
18        MUNAGO REPORTING SERVICES
19        Deb@munagoreporting.com
20        205-862-0089
21
22
23

Page 5

1         I N D E X
2
3     Examination by Mr. Talty..........Page 6
4
5         E X H I B I T S
6
7
8     Plaintiff's Exhibit No. 1         33
9             Marked for identification
10    Plaintiff's Exhibit No. 2        151
11            Marked for identification
12    Plaintiff's Exhibit No. 3        151
13            Marked for identification
14    Plaintiff's Exhibit No. 4        152
15            Marked for identification
16
17
18
19
20
21
22
23

2 (Pages 2 to 5)

## Page 6

1  I, Deborah K. Munago, a Registered
2  Professional Reporter and Notary Public for
3  the State of Alabama, acting as commissioner,
4  certify that there came before me at 2015 1st
5  Avenue North, Birmingham, Alabama, on April
6  10, 2009, beginning at 10:15 a.m., BRENDA
7  LOVELADY SPAHN, a witness in the above cause,
8  for oral examination, whereupon the following
9  proceedings were had:
10
11        BRENDA LOVELADY SPAHN
12     Having been first duly sworn,
13          testified as follows:
14
15  EXAMINATION BY MR. TALTY:
16     Q.   Ms. Spahn, would you state your
17  full name for the record?
18     A.   Brenda Lovelady Spahn.
19     Q.   And I want to make you aware, if
20  you need to take a break or use the restroom,
21  that's fine. Just let me know.
22     A.   Okay.
23     Q.   It's not intended -- sometimes

## Page 7

1  these things are tough, but they are not
2  intended to be torture sessions for you. So
3  if you need to take a break, just let me
4  know.
5     A.   Okay.
6     Q.   Is there any reason today why I
7  couldn't expect your answers to be the truth,
8  the whole truth, and nothing but the truth?
9     A.   No.
10     Q.   You understand your testimony
11  today is under oath?
12     A.   Yes.
13     Q.   And if it were not truthful, it's
14  subject to the penalty of perjury?
15     A.   Yes.
16     Q.   Which in federal cases, it's a
17  penalty up to five years?
18     A.   Yes.
19     Q.   I advise everybody of that. It's
20  not just you. So I want you to know that I'm
21  not picking on you. Just want folks to know
22  this is important to you. It's also
23  important to my client, Traci Jones.

## Page 8

1     You are not taking any
2  medications that would affect your ability to
3  recall events?
4     A.   No.
5     Q.   All right. Do you -- have you
6  always gone by the name you just gave us,
7  which, I believe, is Brenda Lovelady Spahn?
8     A.   No. I was married before.
9     Q.   Okay. What was your name then?
10     A.   Brenda Lovelady Shiflett.
11     Q.   What was your maiden name?
12     A.   Lovelady, Brenda K. Lovelady.
13     Q.   Okay. What's your Social
14  Security number?
15     A.   ▓▓▓▓▓
16     Q.   And your date of birth?
17     A.   ▓▓▓▓▓
18     Q.   And do you have a cell phone?
19     A.   ▓▓▓▓▓
20     Q.   Now, was that the same cell phone
21  number that you had between June of 2006
22  until about August of 2007?
23     A.   Yes.

## Page 9

1     Q.   Do you have any other cell phones
2  that you use?
3     A.   No.
4     Q.   What is your office number?
5     A.   ▓▓▓▓▓
6     Q.   Where is that office?
7     A.   7916 2nd Avenue South.
8     Q.   Now, is that part of Freedom
9  Rain?
10     A.   Yes.
11     Q.   Do you have any other offices?
12     A.   No.
13     Q.   Do you have any other phone
14  numbers?
15     A.   Home phone number.
16     Q.   What is that?
17     A.   Okay. I just got Vonage, and
18  they gave me a new number. And I don't
19  remember it.
20     Q.   Did you have that number during
21  the time period of June 2006 through 2007?
22     A.   No. I have only had it about a
23  week. I think it's ▓▓▓▓▓

Page 10

1    Q.    And do you have a work e-mail
2  address?
3    A.    Yes.
4    Q.    What is that?
5    A.    ████████████████
6    Q.    Do you have a personal e-mail
7  address other than that?
8    A.    No.
9    Q.    That's the only e-mail address
10 you have?
11    A.    Yes, sir.
12    Q.    You said you were married
13 previously to a Mr. Shiflett?
14    A.    Yes.
15    Q.    Is he still alive?
16    A.    Yes.
17    Q.    What is his name?
18    A.    Michael.
19    Q.    Does he have a middle initial?
20    A.    T.
21    Q.    Does he reside in this area, or
22 do you know where he resides?
23    A.    Africa.

Page 11

1    Q.    That's interesting.
2    A.    But he is in the United States,
3  some in Florida, but I don't know his
4  address.
5    Q.    Okay.  Do you know where he
6  resides in Africa?
7    A.    No.  South Africa.  Maybe the
8  Congo.  It's on the coast.  I don't remember.
9    Q.    So you don't see him very often?
10    A.    I haven't seen him in years.
11    Q.    Now, who is your present husband?
12    A.    Jeff Spahn.
13    Q.    Does he have a middle initial?
14    A.    T.
15    Q.    Do you have any children?
16    A.    Yes.  I've got a lot of kids.
17    Q.    You have a lot of kids?
18    A.    Yes.
19    Q.    Who are your children?
20    A.    Beau, Matthew, Melinda, Miranda,
21 ████████, and two foster kids now, ████and
22 ████████
23    Q.    Now, is Beau -- how does he spell

Page 12

1  that?
2    A.    B-E-A-U.
3    Q.    And his last name is?
4    A.    Gregory.
5    Q.    And he's your son?
6    A.    Yes.
7    Q.    And Matthew?
8    A.    Gregory.
9    Q.    Son also?
10    A.    Yes.
11        Melinda Megahee.  She's Matthew's
12 twin.
13    Q.    And Miranda?
14    A.    Shiflett -- oh, I'm sorry --
15 Williamson.
16    Q.    Okay.  And ████████?
17    A.    Spahn.
18    Q.    And now, ████and ████████ are they
19 children, young kids?
20    A.    Yes.  They are 13 and 11.  And
21 they have actually taken Spahn as their name.
22    Q.    Now, did you have a child by
23 Mr. Gregory?  Is that --

Page 13

1    A.    Three kids.
2    Q.    Okay.  Were you -- were you
3  married to Mr. Gregory?
4    A.    Yes.  This was when I was a
5  teenager, years and years ago.
6    Q.    Okay.  What was Mr. Gregory's
7  name?
8    A.    Cecil.
9    Q.    Do you know his middle initial?
10    A.    L.
11    Q.    Do you know where he resides?
12    A.    Atlanta, Georgia.
13    Q.    Do you know the street address?
14    A.    No.
15    Q.    Do you know his phone number?
16    A.    No.
17    Q.    Do you know what he does for a
18 living?
19    A.    He's retired.
20    Q.    That's a good thing to be
21 nowadays.
22        Can you tell me, first of all,
23 where you live now?

4  (Pages 10 to 13)

## Page 14

1  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓
2  ▓▓▓
3  Q.  How long have you lived there?
4  A.  Four years.
5  Q.  Where did you live before that?
6  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  Trussville.
8  Q.  Do you know that address?
9  A.  No, I don't remember.
10  Q.  How long did you live there?
11  A.  About a year.
12  Q.  And where did you live before
13  that?
14  A.  ▓▓▓▓▓▓▓▓▓▓▓▓
15  Q.  How long did you live at
16  Hob Hill Road at that time?
17  A.  Twelve years.
18  Q.  Where do you work presently?
19  A.  The Lovelady Center.
20  Q.  How long have you worked there?
21  A.  Four and a half years.
22  Q.  Where did you work before that?
23  A.  Excell Financial.

## Page 15

1  Q.  How long did you work for Excell
2  Financial?
3  A.  About five years.
4  Q.  And are they still in business?
5  A.  No.
6  Q.  When did they go out of business;
7  do you remember?
8  A.  It was my husband's company. I
9  don't remember. He dissolved the corporation
10  maybe a couple of years ago.
11  Q.  Was that Jeff Spahn?
12  A.  Yes.
13  Q.  What did Excell Financial do?
14  A.  Mortgages and real estate
15  investments.
16  Q.  And where did you work before
17  Excell Financial?
18  A.  Tax Max. But I worked at Excell
19  and Tax Max some at the same time.
20  Q.  Other than the five years that
21  you worked at Excell Financial, how many
22  years did you work at Tax Max?
23  A.  Probably about 20-something

## Page 16

1  years.
2  Q.  And who was your supervisor?
3  A.  I really didn't have one.
4  Melinda was the -- my daughter was the E --
5  ERO. Is that what you call them? I forget
6  what they call them.
7  Q.  I'm not sure what --
8  A.  It's a representative that does
9  electronic filing. And she -- she -- she
10  owned -- she owned Tax Max. It was like fast
11  refunds for her.
12  Q.  So Melinda owned that?
13  A.  Yes.
14  Q.  Did anyone else own it with her?
15  A.  I don't think so.
16  Q.  And you're referring to
17  Melinda Megahee?
18  A.  Yes.
19  Q.  Did you work any place else
20  during that 20 years other than Excell?
21  A.  No.
22  Q.  Okay. Where did you work before
23  Tax Max?

## Page 17

1  A.  Well, Tax Max was taxes.
2  Q.  Right.
3  A.  I don't know exactly what year
4  they called it Tax Max. But prior to that, I
5  just did taxes on my own, independently. So
6  I'm not exactly sure of the date they
7  incorporated that. And I did it inside --
8  under that. But before that, I did taxes all
9  those years.
10  Q.  And Did you do that under your
11  name?
12  A.  Yes.
13  Q.  Brenda Spahn?
14  A.  Yes. Or Shiflett.
15  And before that, it was Internal
16  Revenue. And that was --
17  Q.  But that name's taken.
18  A.  Yeah. I think it was
19  30-something years ago. I don't remember
20  exactly. Matthew is 32, and they were babies
21  when I left. So it was about 33 years ago.
22  Q.  Okay. Now, when you said
23  Internal Revenue, was that the name of a

Page 18

1  company?
2      A.   No, no, no.  I worked for
3  Internal Revenue Service.
4      Q.   Oh, you actually worked for
5  the --
6      A.   Yes.
7      Q.   I thought you were telling me the
8  name of a --
9      A.   No, no, no, no.  For Internal
10 Revenue Service.
11     Q.   Okay.  And what did you do for
12 the IRS?
13     A.   I was a taxpayer representative.
14     Q.   And that was about 32 years ago?
15     A.   Yeah.  Give or take a few months.
16     Q.   I understand.  So you have done a
17 lot -- you've done a lot of tax work --
18     A.   Right.
19     Q.   -- before working for the
20 Lovelady Center?
21     A.   Yes.
22     Q.   And did you sell anything?  Real
23 estate -- did you sell real estate and

Page 19

1  mortgages?
2      A.   Some.  But that's predominantly
3  my husband.  Mine was doing the tax --
4  managing the tax office, working with
5  Melinda.  She actually managed it.  I do a
6  lot -- I did a lot of marketing for it.  I,
7  more or less, did marketing rather than the
8  actual investment.  I don't even know how to
9  do a mortgage.
10     Q.   Did y'all -- the organization
11 with your husband and yourself, did y'all
12 sell anything other than mortgages and real
13 estate?
14     A.   Yeah.  My husband had sold real
15 estate for years in California and Texas, and
16 when we moved to Alabama, he bought and sold
17 real estate and invests.
18          Now, when Jeff was buying and
19 selling houses, and what I did was -- I'm an
20 artist.  I like to paint and decorate, so I
21 did some of that on the houses.  But I did --
22 most of them, I actually didn't even see.
23 But occasionally, I would do something with

Page 20

1  colors if they were down on the coast.
2      Q.   Okay.  And you say you did -- you
3  painted houses and were paid for that as well
4  as mortgages and --
5      A.   No, not paint them.  Decorate.
6      Q.   Decorate.  Interior decoration?
7      A.   Interior design, yes.
8      Q.   Okay.  Did you sell anything else
9  we haven't covered?  Mortgages, real estate,
10 interior design work, taxes?
11     A.   I can't think of anything.
12     Q.   Do any of the children that you
13 mentioned work for Freedom Rain -- and I
14 guess before you answer that, let me be sure
15 I've got this straight.
16          The organization you work for,
17 what is its exact name?
18     A.   Freedom Rain.  An attorney did
19 it.  I think he did -- I think it's Freedom
20 Rain Ministry or Freedom Rain Outreach.  That
21 is the ministry.  I will have to give you
22 that exact --
23     Q.   So You think the formal name is

Page 21

1  Freedom Rain Ministry?
2      A.   That's the ministry.  That's
3  501c3.
4      Q.   Is Freedom Rain Ministry?
5      A.   Or Freedom Rain Outreach.  I know
6  you're looking for the exact name, and I
7  don't -- it's a legal name, and I'm not sure
8  exactly what he had.  Melinda did that.  I
9  very seldom deal with all that kind of stuff.
10     Q.   Okay.  Now, you say that's the
11 ministry.  What else is there that's not a
12 ministry?
13     A.   Nothing.
14     Q.   Okay.  And so you work for either
15 Freedom Rain Ministries or Freedom Rain
16 Outreach?
17     A.   Whichever it is.  Which the
18 Lovelady Center is the program for women.
19 Everybody gets that confused because they
20 think we're just the Lovelady Center, but the
21 501(c)(3) is the parent ministry.
22     Q.   So the Lovelady Center is part --
23 do you mind if I call Freedom Rain Ministries

Page 22

1  or Freedom Rain Outreach just Freedom Rain?
2      A.    That's what I call it.  That's
3  why I don't know the third word.
4      Q.    Let's do that in this deposition
5  so we don't get confused.
6            So Lovelady Center program,
7  that's part of Freedom Rain Ministries;
8  that's a program of --
9      A.    Yeah.  What happened it's a --
10  it's a ladies ministries, and somehow
11  everybody just picked up on the name
12  Lovelady.  And they don't -- that was never
13  the intention.  The program is Lovelady, but
14  I guess everybody just likes the name, so
15  everybody calls it Lovelady.
16      Q.    Okay.  The program is Lovelady.
17  Is the Lovelady Center a building?
18      A.    Yes.  It's that building.
19      Q.    Which building is that?
20      A.    7916 2nd Avenue South.  It's the
21  old East End Memorial Hospital.
22      Q.    Now, does Freedom Rain own that
23  building?

Page 23

1      A.    Well, there's a -- yes.  It's --
2  it's like if you owe -- do you own your
3  house?  There's a mortgage on it.  So do we
4  own the building?  There is a mortgage on it.
5      Q.    You own it, but you owe a debt on
6  it?
7      A.    Two debts.
8      Q.    Two debts.  Who are the debts
9  owed to?
10      A.    St. Vincent's owns the first one
11  at $900,000; Kim Ratliff has a second.
12      Q.    Do you know how much that one is
13  for?
14      A.    $300,000.  And now there's a lien
15  on it from Engineer Cooling for --
16      Q.    He can't -- he can't answer
17  questions because, he and I are attorneys.
18  He'd probably be able to, but he's not
19  supposed to.
20      A.    Okay.  I'm sorry.  I'm just --
21      Q.    You don't recall what that is?
22      A.    No.
23      Q.    If you don't recall, that's fine.

Page 24

1  I want you to think about things.  But if you
2  don't recall, that's fine, too.
3      A.    I don't know.  Very seldom do I
4  deal with the money part.
5      Q.    You -- now, you say you went to
6  work for the Lovelady Center about four and a
7  half years ago.  You mean you went to work
8  for Freedom Rain Ministries about four and a
9  half years ago?
10      A.    Yes.
11      Q.    Okay.  Was it called Freedom Rain
12  Ministries at that time?
13      A.    Yes.  It was not called Lovelady.
14  It was Freedom Rain.
15      Q.    Now, you mentioned, a minute ago,
16  Freedom Rain, it was -- Freedom Rain
17  Ministries was a 501(c)(3).  Do you know if
18  it was a 501(c)(3) between June of 2006 and
19  August of 2007?
20      A.    Absolutely.
21      Q.    And you said an attorney set that
22  up.  Who did that?
23      A.    Michael French.  But he's not in

Page 25

1  business anymore, but I have the papers.
2      Q.    I think we have asked for those
3  papers as part of the production request.  If
4  you'll give those to your attorney.
5            How did Freedom Ministries come
6  about?  Can you give me a history of how it
7  got started and your employment with them?
8      A.    Yes.  I give them every day.  I
9  would love to give it to you.
10            Internal Revenue actually raided
11  my tax office on April 15, 2002, and when
12  they raided my tax office, it was just a
13  terrible, emotional thing.
14            I feel like I was called into the
15  ministry when I was about 11 years old and I
16  never went.  After the -- the raid, I started
17  dealing with the legal system, and I was very
18  despondent at what I found.  And I decided
19  that I would go full-time into the ministry.
20  And so I went into the ministry and I started
21  going into prisons and just preaching and
22  teaching and ministering to the women.  And
23  then I found out that that really wasn't what

7 (Pages 22 to 25)

Page 26

1 they needed because when they get out, they
2 absolutely have nowhere to go.
3         So most of my kids were grown.
4 And so I had a house in Roebuck, the Hob Hill
5 house. And so I moved out of the Hob Hill
6 house and we moved to Carrington. And we
7 started Freedom Rain to -- for the women to
8 be able to have a place to go when they got
9 out of prison. And that's why it started.
10    Q.    Okay. What -- what year was
11 that; do you know?
12    A.    2000 and --
13    Q.    About?
14    A.    It was two -- all right. The
15 first women came in 2004, in October. So I
16 probably moved out like in June or July
17 because I had to get it ready.
18    Q.    You say you moved out. You moved
19 out --
20    A.    I moved to Carrington.
21    Q.    Okay. Is Carrington a larger
22 house?
23    A.    Oh, no, much smaller. Hob Hill

Page 27

1 is a very large house.
2    Q.    And how many women?
3    A.    I started with five, and it
4 quickly went to 40, like overnight. There is
5 a big need for this.
6    Q.    Yeah. I believe there is a need
7 for this.
8    A.    And it went to 40.
9    Q.    And are you still at Carrington?
10    A.    No. What happened is -- do you
11 want me to just tell you what happened?
12    Q.    Sure.
13    A.    What happened is the neighbors
14 got up in arms in Hob -- in the neighborhood.
15 And it was a terrible time because they
16 thought I was destroying the neighborhood,
17 even though it's nine acres up in the middle
18 of nowhere. And so the zoning was not proper
19 for Hob Hill. You know, the residential
20 zoning say you can only have three unrelated
21 people in a residence. And so I had to move.
22 I mean, I had -- I had to move the women out
23 of Hob Hill. I could not -- I did not have

Page 28

1 any -- you know, someone bought Carrington,
2 and we moved back to Hob Hill so it would be
3 closer to the center when we found the
4 center.
5    Q.    And Did you take some ladies in
6 at Hob Hill when you moved back?
7    A.    Yeah. A few lived there. But
8 like I say, you cannot -- I could only have
9 two at a time because of the zoning
10 regulation. And so what happened is
11 everybody moved to the center.
12    Q.    Okay. And the center was?
13    A.    The old East End Memorial
14 Hospital.
15    Q.    And that's where you currently
16 are?
17    A.    Yes.
18    Q.    And that's what you call the
19 Lovelady Center?
20    A.    Yes. We moved into there in
21 October of 2005.
22    Q.    How many ladies do you house at
23 the Lovelady Center?

Page 29

1    A.    336 as of yesterday.
2    Q.    Is that kind a typical number
3 that are there?
4    A.    It runs between 300 -- that's the
5 highest ever.
6    Q.    It's about on average, it is?
7    A.    310, 315.
8    Q.    It's been that way since October
9 2005?
10    A.    No. No, no, no, no, no. It
11 started with 40, and then it just -- and then
12 it just went on and on. And probably, this
13 is way more than we've ever had.
14    Q.    During the period of interest to
15 this lawsuit, which is June of 2006 through
16 August of 2007, is it fair to say you had
17 about 300?
18    A.    No.
19    Q.    How many did you have during that
20 period?
21    A.    I would have to look at the
22 records. Probably about maybe 200 would have
23 been max.

8 (Pages 26 to 29)

Page 30

1    Q.    You mentioned the IRS raided your
2  tax office?
3    A.    Yes.
4    Q.    Were you arrested as part of
5  that?
6    A.    No. No indictment was filed, but
7  I did a plea bargain with -- with my daughter
8  for failure to supervise, one count, failure
9  to supervise, aiding and abetting of filing a
10 fraudulent tax return or failure to supervise
11 the filing of such. And I got -- I just
12 accepted probation and a $300 fine.
13   Q.    So you -- you were convicted?
14   A.    I pled, yes, so it's a conviction
15 that shows.
16   Q.    Had you ever been arrested
17 before?
18   A.    No.
19   Q.    For anything?
20   A.    No.
21   Q.    For anything at all?
22   A.    No. But I have got some speeding
23 tickets.

Page 31

1    Q.    I'm not -- not too worried about
2  that.
3    A.    A pretty good many to be honest
4  with you. I used to have a problem speeding.
5    Q.    And you say that the IRS raid was
6  as a result of one tax return?
7    A.    No. That's what I pled guilty
8  to.
9    Q.    To one count or one tax return?
10   A.    One count.
11   Q.    And that count was a fraud count,
12 if I understood?
13   A.    You know, I tried to call my
14 attorney yesterday because I felt like you
15 would be asking that. I don't know the exact
16 deal. I don't know the exact -- I know it's
17 one count. That's what he told me. I think
18 it was three returns, maybe four.
19   Q.    Ms. Spahn, I'm going to show you
20 a press release dated June 28, 2004 from the
21 U.S. Department of Justice and give you a
22 chance to read that.
23        I just want to know if you

Page 32

1  disagree with anything that's stated in that
2  press release.
3    A.    All right. I -- I got the
4  $125,000 back. They did not keep it. And
5  this looks like they kept it. The $19,000, I
6  did not have to pay. I don't know. They did
7  not come up with that. And it was -- I don't
8  know why it was one count, but it was only
9  one count. Maybe that was earlier or
10 something. I don't know. So I don't think
11 it's totally accurate but --
12   Q.    Do you see anything else in there
13 that may be wrong?
14   A.    Well, I didn't -- I didn't stay
15 on probation for three years. They dropped
16 that.
17   Q.    Did they -- they reduce it, or is
18 that --
19   A.    No.
20   Q.    -- incorrect?
21   A.    No. They dropped it. I'm not
22 sure. Sam McCord was my attorney, and he
23 will know any of the legal. I -- I didn't

Page 33

1  really -- I don't know -- I don't know the
2  exact facts. You will have to call him.
3        MR. TALTY: Let's mark that as
4  Plaintiff's Exhibit 1.
5        (Plaintiff's Exhibit No. 1
6        marked for identification.)
7    Q.    How much do you -- what is your
8  title at the Lovelady Center?
9    A.    Executive director.
10   Q.    Have you always been the
11 executive director?
12   A.    Yes.
13   Q.    Because of the way that Freedom
14 Rain came about -- here again, I'm talking
15 about Freedom Rain Ministries.
16   A.    That's okay.
17   Q.    I'm trying to keep it straight
18 for the record.
19        Since you developed it, I'm under
20 the impression that you assumed the position
21 of executive director; is that correct?
22   A.    Yes.
23   Q.    And how much do you make

9 (Pages 30 to 33)

Page 34

1  currently as the executive director?
2      A.   Well, when we get paid --
3          MR. DONALDSON:  Can I ask what's
4  the relevance of this?  Where are you going
5  with this?
6          MR. TALTY:  She can -- she can
7  answer.
8          MR. DONALDSON:  Well, I'm going
9  to tell her she doesn't have to because I
10  don't see what her salary has got to do with
11  anything.
12          MR. TALTY:  It does.  If you want
13  to instruct her not to answer, you can.
14          MR. DONALDSON:  Well, no.  I'm
15  just asking you why you think it's relevant.
16  And if you can give me some reason why we're
17  wasting time on Good Friday --
18          MR. TALTY:  Well, you opened the
19  door as to the non-profit status of the
20  corporation.
21          MR. DONALDSON:  I didn't open any
22  doors.  I'm just here to --
23          MR. TALTY:  Well, I believe you

Page 35

1  have in some of the documents that you filed
2  and some of the statements you made before,
3  so that's -- that's opened the door to a lot
4  of questions.
5          MR. DONALDSON:  Opened the door
6  to what?
7          MR. TALTY:  Questions related to
8  the nonprofit status of this organization.
9          MR. DONALDSON:  Well, in truth of
10  the matter, it has been granted a nonprofit
11  status by the IRS, not that that -- what's
12  your point?
13          MR. TALTY:  We are still allowed
14  to ask.
15          MR. DONALDSON:  I'm sorry?
16          MR. TALTY:  We're allowed to ask.
17          MR. DONALDSON:  Allowed to ask
18  what?
19          MR. TALTY:  Discovery is pretty
20  broad.  And we're allowed to ask these
21  questions.
22          MR. DONALDSON:  How much money
23  somebody makes?

Page 36

1          MR. TALTY:  Sure.
2          MR. DONALDSON:  What's the
3  relevance of that, if any?
4          MR. TALTY:  If you want to
5  instruct her not to answer, or if you want --
6  both of us call the judge and have this
7  conversation, you can.
8          MR. DONALDSON:  You can go ahead
9  and answer.  I'm just telling you that
10  we're -- you know, we're wasting time.
11          MR. TALTY:  You've agreed to the
12  usual stipulations.  And we are wasting time
13  having the discussion.
14      A.   It's $1100.  But I don't get it
15  most of the time.
16      Q.   $1100 per month?
17      A.   Week.
18      Q.   Per week.  Do you know what your
19  -- how much you made in 2007 working there?
20      A.   About -- I don't know.  I don't
21  think I got any -- anything in 2007.  I might
22  have gotten something.  I don't know.
23      Q.   Now, your attorney can't answer

Page 37

1  for you.  You keep looking for him.
2      A.   Any time I don't know something,
3  I feel bad because I don't know it, but I
4  don't know.  In 2007, I don't -- I might have
5  got maybe $10,000.  Just because it's $1,100
6  a week, I don't get that.  You need to know
7  that.
8      Q.   Well, you -- you stated that.
9  And that's why I was asking you how much you
10  made in the year 2007 --
11      A.   No.
12      Q.   -- or the year 2006?
13      A.   No.
14      Q.   Do you have any idea how much you
15  made?
16      A.   No.
17      Q.   And do you receive any other
18  benefits other than the $1,100 a week?
19      A.   Yes.
20      Q.   What do you receive?
21      A.   The ministry pays for my cell
22  phone, which I use probably 24 hours a day
23  for it.  We live in Hob Hill.  My daughter

10  (Pages 34 to 37)

Page 38

1 and her family lives in Hob Hill, too,
2 because they lost their house.
3        Q.   Is that Melinda?
4        A.   Yes. But -- and for the record,
5 Hob Hill is in foreclosure now, so I may have
6 to move to the center so my address may
7 change. And --
8        Q.   But now, does -- you were
9 explaining to me that -- what are the
10 benefits you get?
11       A.   I live in Hob Hill.
12       Q.   Well, does Freedom Rain own Hob
13 Hill; is that what you're saying?
14       A.   Yes. And my car -- there's not
15 enough transportation at the center, so my
16 car is actually paid for by the center. But
17 the center uses my car all the time, so it's
18 not really my car. It's like the center's
19 car. So maybe I use the center's car. But I
20 get ten -- I get -- I have to pay taxes on
21 the car and the fair rental value of Hob
22 Hill. Kind of like -- it's like a minister.
23 Although I did not elect not to pay Social

Page 39

1 Security, so I have to pay Social Security on
2 it too.
3        Q.   And did -- did Freedom Rain buy
4 Hob Hill from you?
5        A.   No. I deeded it to them when I
6 moved to Carrington.
7        Q.   But you didn't get anything for
8 it?
9        A.   No. No. As a matter of fact, at
10 that time, Excell was doing better so I was
11 able to put -- much to my husband's duress, I
12 put our money into the center to buy the
13 furniture and all for the center.
14            But we have audited financials.
15 As of the end of 2006, the center owed us
16 like 70-some thousand dollars.
17       Q.   Okay. What did the center owe
18 you the $77,000 for?
19       A.   I bought the furniture and all of
20 the things we put in --
21       Q.   The things you put in --
22       A.   -- the center. We didn't get the
23 money back.

Page 40

1        Q.   Okay. So there's -- there's also
2 a debt of Freedom Rain to you?
3        A.   Yes. But I don't hold a mortgage
4 on it.
5        Q.   Okay. And is that to you and
6 your husband?
7        A.   No. It's my husband -- it's to
8 Excell.
9        Q.   Oh, it's to Excell?
10       A.   And then it transferred to my
11 husband because it was his.
12       Q.   And that's -- that's for $77,000?
13       A.   It was. I just happened to know
14 that figure. I don't know what it was for.
15 -- the audit is not back for 2007. The
16 auditor tells us that, not me. We have an
17 independent CPA that has to do the audit.
18       Q.   Who is that?
19       A.   I don't -- my daughter does all
20 of that. I don't know his name. Mike
21 somebody.
22       Q.   So if I understand this, you put
23 $77,000 into buying furniture for Freedom

Page 41

1 Rain?
2        A.   No.
3        Q.   You did not say that?
4        A.   I put a lot more than that.
5 That's what was owed at that time, at the end
6 of 2006.
7        Q.   All right. But that's money
8 you -- whatever the amount is?
9        A.   My husband, Excell.
10       Q.   He put it in?
11       A.   Yes.
12       Q.   And you didn't own any part of
13 Excell?
14       A.   No. But it was his.
15       Q.   Okay. Did you get his approval
16 to buy all the furniture?
17       A.   Yes. He was with me. I wouldn't
18 steal from him.
19       Q.   Now, I wasn't accusing you. I
20 was just trying to find out --
21       A.   Yeah.
22       Q.   -- how the money came to be
23 spent?

11  (Pages 38 to 41)

Page 42

1    A.    Yeah.
2    Q.    All right. You mentioned the
3  center provides a car for you?
4    A.    Well, I had a car. The center
5  can't -- most of the time, the center doesn't
6  have enough transportation for all these
7  women. We have vans and all, but the center
8  uses my car all the time -- or it was my car.
9  I guess now -- I mean, the center pays for
10 it. I say it's 25 percent mine is what we
11 figured out and 75 percent the center's.
12   Q.    And who paid for the car?
13   A.    The center.
14   Q.    Okay. Now, in --
15   A.    But in 2006 and -7, I think --
16 I'm positive -- during your period, is that
17 all I need to --
18   Q.    Well, we're going to -- we're
19 going to change periods, but right -- but
20 right now let's talk about that period --
21   A.    The center does.
22   Q.    -- June 2006 through August 2007?
23   A.    I paid for it, but the center

Page 43

1  still used it.
2    Q.    Okay. You bought the car you
3  have between --
4    A.    My husband bought it.
5    Q.    Your husband bought it?
6    A.    Right.
7    Q.    Did he buy it as Excell, or did
8  he buy it individually?
9    A.    Individually.
10   Q.    Okay. So that was your own car
11 that you used from June of 2006 to August of
12 2007?
13   A.    Yes.
14   Q.    And then after that --
15   A.    Sometime during that period, the
16 center had to start using it all the time.
17   Q.    Okay. Now, did you drive this
18 car to and from home?
19   A.    Yes. Most of the time.
20 Sometimes I don't -- sometimes I don't get
21 to. But most of -- I'd say 70 percent of the
22 time I get to, and 70 percent I don't -- I
23 mean, 30 percent I don't.

Page 44

1    Q.    My question is: Do you -- do you
2  drive it home -- to work and from work back
3  to your home every day?
4    A.    No, not every day.
5    Q.    Okay. Do you go home every day?
6  The days you go home, do you drive this car
7  to and from work?
8    A.    Sometimes. Sometimes I don't get
9  to because the car's not there.
10   Q.    Okay. How do you get to and from
11 work on those days?
12   A.    Well, people drop me off, I'll
13 ride with somebody, or I'll get
14 transportation to take me. It's not that
15 far.
16   Q.    I see. And how often does that
17 occur on average?
18   A.    I don't know.
19   Q.    What kind of car is this that you
20 currently drive?
21   A.    A Nissan.
22   Q.    A Nissan?
23   A.    Murano.

Page 45

1    Q.    And before the Nissan, what sort
2  of car did you have?
3    A.    I had a Lexus and an Escalade.
4    Q.    Did the center buy the Escalade?
5    A.    No.
6    Q.    You bought -- that was your
7  personal car?
8    A.    Yes.
9    Q.    You bought that or your husband
10 bought that one?
11   A.    And I paid for it -- or he paid
12 for it, cash.
13   Q.    How about the Lexus? Did you own
14 that, or did the center own it?
15   A.    I did -- or he did.
16   Q.    And the Murano is the one the
17 center bought?
18   A.    No. The one my husband bought.
19   Q.    Okay. That -- what was the car
20 that you said that the center bought?
21   A.    The center pays the payments on
22 the Murano now. Then it didn't.
23   Q.    Did the center make the payments

12  (Pages 42 to 45)

## Page 46

1 on the Lexus?
2   A.   No. I didn't have the Lexus very
3 long.
4   Q.   Did anyone advise you that you
5 should not be buying a Lexus as an executive
6 director?
7   A.   No.
8       MR. DONALDSON: I'm going to
9 object on the grounds that whatever advice
10 she got would be covered by the
11 attorney/client privilege.
12   Q.   Other than by your attorney -- I
13 don't want you to disclose communications you
14 had with your attorneys. But has anybody --
15   A.   No --
16   Q.   -- other than your attorneys
17 advised you --
18   A.   No. I just -- I just couldn't
19 afford it. And I didn't think -- no, I just
20 got rid of it. I didn't -- I didn't want it.
21 I don't want things like that anymore.
22   Q.   So nobody ever told you you gave
23 --

## Page 47

1   A.   No.
2   Q.   -- the wrong impression driving a
3 Lexus?
4   A.   No. I mean, I just -- I have got
5 enough sense to know, I couldn't afford it
6 anymore.
7   Q.   You were talking about Hob Hill
8 and who owns it. Tell me what property you
9 currently have an interest in.
10   A.   Who, me?
11   Q.   Yes, ma'am.
12   A.   I've lost every piece of property
13 I had. I own zero. My husband owns zero.
14 Everything was foreclosed on.
15   Q.   Where does Beau Gregory work?
16   A.   My son?
17   Q.   Yes. Do you know?
18   A.   Yeah. Do I have to answer --
19 what does he have to do with this?
20   Q.   You can answer.
21   A.   Select -- oh, he doesn't own it
22 anymore. No, I don't know the name of --
23 some man in Orange Beach.

## Page 48

1   Q.   So he's not here in Birmingham;
2 he is in --
3   A.   No.
4   Q.   Orange Beach?
5       And you're not sure where he
6 works?
7   A.   It's an individual man. I don't
8 know the man's name.
9   Q.   Where does Matthew work?
10   A.   For himself.
11   Q.   Is he here in Birmingham?
12   A.   Yes.
13   Q.   What does he do?
14   A.   Buys and sells real estate.
15   Q.   Has he bought or sold any real
16 estate for Freedom Rain?
17   A.   No.
18   Q.   How about Melinda? Where does
19 she --
20   A.   She works with me at Freedom
21 Rain.
22   Q.   What is her title?
23   A.   Director.

## Page 49

1   Q.   Now, you're the executive
2 director. She is the director under you?
3   A.   There are two directors.
4   Q.   Okay. And those two are you and
5 Melinda or someone else?
6   A.   No. I am the executive director.
7   Q.   Who is the other director other
8 than Melinda?
9   A.   Lindsay Lee.
10   Q.   And was Lindsay there between
11 June 2006 and August 2007?
12   A.   Yes.
13   Q.   She's still there, I take it?
14   A.   Yes.
15   Q.   How about Miranda Williamson?
16   A.   She works in the child care
17 center.
18   Q.   Okay. Where is the child care
19 center?
20   A.   7916 2nd Avenue South.
21   Q.   Is that Freedom Rain?
22   A.   Yes.
23   Q.   And ████████?

Page 50

1     A.    He's nine.
2     Q.    Oh, he's nine, okay. So
3  fortunately -- hopefully, he's not working
4  right now.
5     A.    No. He doesn't work with me.
6     Q.    Do you have any other relatives
7  that work for Freedom Rain?
8     A.    Miranda's husband.
9     Q.    Who is Miranda's husband?
10    A.    Christian Williamson.
11    Q.    What does Christian do for
12 Freedom Rain?
13    A.    He oversees the building. He was
14 there in the beginning, in the maintenance,
15 the operations of the building.
16    Q.    Any other relatives work for
17 Freedom Rain?
18    A.    No.
19    Q.    Do you know how much Melinda
20 Megahee is paid annually?
21    A.    She doesn't get it on time. She
22 makes -- she should be paid 700 a week for
23 about a hundred hours.

Page 51

1     Q.    And how about Miranda?
2     A.    400. She gets $10 an hour.
3     Q.    And how about Christian
4  Williamson?
5     A.    500.
6     Q.    And all that's per week; right?
7     A.    Yes.
8     Q.    Do you know if Freedom Rain does
9  business with any of your relatives?
10    A.    No. I know it does not.
11    Q.    How about does Freedom Rain do
12 business with any spouses of your daughters?
13    A.    No.
14    Q.    Does Freedom Rain permit any
15 businesses to come to the Lovelady Center to
16 solicit business from the clients there?
17    A.    Not that I am aware of. One time
18 a lady came in there trying to sell Mary Kay.
19 Once in a while, an Avon lady will come in
20 there.
21    Q.    Anybody else allowed to come in?
22    A.    Well, I say no, but sometimes
23 people slip by because it's a big place. I

Page 52

1  don't think so. I don't know of any.
2     Q.    Do folks that come in there have
3  to get any approvals from the executive
4  director or the directors to come in to
5  solicit clients for business?
6     A.    Well, there's not any.
7           MR. DONALDSON: She testified
8  there weren't any.
9           MR. TALTY: Well, she testified
10 there were a couple of minor ones. I think
11 the Avon lady and somebody else.
12    A.    No. I said they slipped in.
13    Q.    Oh, they slipped in. Okay.
14    A.    Yeah. I don't --
15    Q.    So your policy is not to allow
16 anybody to come in?
17    A.    No. I don't -- I don't want them
18 to.
19    Q.    So Freedom Rain's policy is we
20 don't allow businesses to come in and solicit
21 our clients on the premises?
22    A.    Right.
23    Q.    Has any property owned by you or

Page 53

1  your husband been transferred to your
2  daughter or son?
3     A.    No.
4     Q.    Or their spouses?
5     A.    No.
6     Q.    Other than your work at Freedom
7  Rain, do you have alternative sources of
8  income?
9     A.    No.
10    Q.    Do you have an accountant that
11 does your personal taxes? I think we may
12 have gone over this.
13    A.    Well, I do them, and then Gail
14 Stephens looks at them.
15    Q.    Is Gail Stephens a CPA?
16    A.    No.
17    Q.    She reviews them to see --
18          MR. DONALDSON: I'm not -- we've
19 been here an hour. You've yet to ask the
20 first question relevant to any allegations of
21 your complaint. We're not talking about her
22 taxes.
23          MR. TALTY: I'm getting -- I'm

14  (Pages 50 to 53)

Page 54

1  getting to the allegations in the complaint.
2      MR. DONALDSON: Well, good.
3  She's not answering any questions about her
4  taxes.
5      MR. TALTY: Well, I'm going to
6  ask her. If you want to instruct her not to
7  answer, you can.
8      MR. DONALDSON: It's not remotely
9  calculated to lead to relevant evidence.
10      MR. TALTY: I think -- I think it
11  is, and I disagree. And it's my deposition.
12      MR. DONALDSON: It is your
13  deposition. And if you wish to explain why
14  you think it might lead to relevance, I
15  invite you to do so.
16      MR. TALTY: I don't think I have
17  an obligation to explain to you, David,
18  unless you want to raise an issue with the
19  judge, in which case I'll talk to the judge
20  about it.
21      MR. DONALDSON: It's not
22  incumbent on me to do that.
23      MR. TALTY: I think it is. Or

Page 55

1  instruct her not to answer, in which case,
2  I'll call the judge.
3      Q.  Do you know if you are -- you
4  mentioned the problem with the IRS back in
5  2002, I believe. Do you know if you are
6  currently under investigation?
7      MR. DONALDSON: I'm going to
8  object to any questions about any IRS
9  investigation and instruct her not to answer.
10      MR. TALTY: Just instruct her not
11  to answer if that's your move.
12      Q.  Do you know if you are under
13  investigation or not?
14      MR. DONALDSON: Object and
15  instruct her not to answer. Investigations
16  from the IRS aren't reasonably calculated to
17  lead to relevant evidence.
18      MR. TALTY: They are if
19  they're about --
20      MR. DONALDSON: You're just
21  harassing the witness.
22      MR. TALTY: I'm not harassing the
23  witness.

Page 56

1      MR. DONALDSON: Yes, you are.
2      MR. TALTY: No, I'm not. I'm
3  trying to find out if she's under
4  investigation regarding her --
5      MR. DONALDSON: What difference
6  would it make?
7      MR. TALTY: Maybe regarding her
8  nonprofit status.
9      MR. DONALDSON: Well, look at --
10  her nonprofit status is a nonissue.
11      MR. TALTY: Well, you raised that
12  issue.
13      MR. DONALDSON: I did not.
14      MR. TALTY: I got a letter here
15  that says you're saying they're exempt from
16  the FLSA because they are a nonprofit.
17      MR. DONALDSON: I did not say
18  that.
19      MR. TALTY: I believe it says
20  that. And that's the reason I'm asking
21  questions.
22      MR. DONALDSON: No --
23      MR. TALTY: Because I think you

Page 57

1  can answer them.
2      MR. DONALDSON: They are not
3  covered by the FSLRA. A nonprofit status
4  under the Internal Tax Code determines
5  whether they owe income tax. It does not
6  determine what this company does or does not
7  do, which is going to be a dispositive issue
8  I have raised.
9      MR. TALTY: The same things that
10  potentially could qualify or disqualify an
11  organization under the Fair Labor Standards
12  Act can also be the same factors that the IRS
13  will look at.
14      MR. DONALDSON: Well, I -- no.
15      MR. TALTY: I think you can
16  answer that.
17      A.  I don't understand.
18      Q.  I'm sorry.
19      MR. DONALDSON: She's not
20  answering any questions about tax
21  investigation.
22      MR. TALTY: You are instructing
23  her not to answer?

15 (Pages 54 to 57)

Page 58

1      MR. DONALDSON: You heard me,
2  didn't you? Do you want her to read it back
3  to you? I only said it four times.
4      MR. TALTY: Are you instructing
5  her not to answer any tax --
6      MR. DONALDSON: I don't answer
7  your questions.
8      MR. TALTY: Then I don't answer
9  yours either.
10      MR. DONALDSON: I didn't ask you
11  a question.
12      Q.   No. I'm sorry, Ms. Spahn.
13      A.   No. I'm not going to answer it.
14  I don't know what to do.
15      MR. DONALDSON: You don't have to
16  do anything.
17      Q.   So you are not aware of any
18  investigations?
19      MR. DONALDSON: She is not
20  answering any questions about any IRS
21  investigations. That's ridiculous.
22      Q.   Does Freedom Rain file exempt
23  organizational returns?

Page 59

1      A.   Yes.
2      MR. TALTY: We'll take up the
3  matter we were just discussing after I ask,
4  hopefully, the remainder of my questions.
5      Q.   Did you ever receive any payment
6  for housing Hurricane Katrina victims?
7      A.   I didn't. Freedom Rain did.
8      Q.   Freedom Rain did. What sort of
9  payments did Freedom Rain receive?
10      A.   You mean -- you want the amount?
11  I don't know.
12      Q.   Do you know how much it was per
13  person per day or anything?
14      A.   No.
15      Q.   Who is Joy Waldrop?
16      A.   Walter?
17      Q.   Waldrop. Do you know a Joy
18  Waldrop?
19      A.   Yeah. She worked for us for
20  Excell Financial.
21      Q.   Does she -- do you know where she
22  works now?
23      A.   For Freedom Rain. She came about

Page 60

1  five months ago.
2      Q.   What does Joy do for Freedom
3  Rain?
4      A.   She -- she teaches classes. She
5  works with the women. She helps the women
6  make different things that they make. Like
7  right now, they're making dolls. Sometimes
8  they make jewelry. It's good therapy.
9      Q.   Do you know what her title there
10  is?
11      A.   Not the exact title, no. She's
12  not a director.
13      Q.   Who is Debt Relief Services?
14      A.   Debt Relief Services is a
15  nonprofit that Freedom Rain actually acquired
16  and changed the name to Freedom Rain.
17      Q.   Do you know when it was acquired?
18      A.   2000 and -- 2004.
19      Q.   Do you know who it was acquired
20  from?
21      A.   Well, Free -- you can't own
22  nonprofits, so they are set up by boards.
23  And I don't know. I don't know. There's not

Page 61

1  an owner of a nonprofit.
2      Q.   Was money paid to acquire Debt
3  Relief Services?
4      A.   No. Bob Prescott did that, and
5  he now is back at the center.
6      Q.   Is Bob Prescott an attorney?
7      A.   No. Bob Prescott is actually now
8  executive director of Freedom Rain.
9      Q.   I thought you were the executive
10  director of Freedom Rain.
11      A.   I'm at the Lovelady Center. I
12  deal with the program and the women's side.
13  He deals with the business side.
14      Q.   Okay. So earlier when you were
15  telling me that you were the executive
16  director, you're the executive director of
17  the Lovelady Center?
18      A.   Yes, and founder.
19      Q.   And he is the executive director
20  of the --
21      A.   Freedom Rain. But he wasn't in
22  those years.
23      Q.   What was he in those years?

16 (Pages 58 to 61)

Page 62

1      A.    I don't know.  I don't remember.
2  He -- he worked with -- he worked with Debt
3  Relief Counseling Services up until 2004.
4  And then he worked with Freedom Rain for a
5  short time, and then he left.  And I don't
6  know where he went to work.
7      Q.    Do you know how much he's
8  currently paid by Freedom Rain?
9      A.    Well, actually, his salary is
10 paid by some people on the board.  And I
11 don't know what it is.
12     Q.    Are there -- are there other
13 people in the Birmingham area that do what
14 Freedom Rain does?
15     A.    We are the largest in the United
16 States is what I have been told.  And the
17 only place -- there's two places that do
18 similar, that service women.  And that is
19 Jessie's Place and Olivia's House.  Olivia's
20 House is where Traci was a client.
21     Q.    How about the foundry?  Do they
22 do similar work?
23     A.    The foundry doesn't have women

Page 63

1  and children, no.  They are nothing -- they
2  are a substance-abuse facility.
3      Q.    Are y'all a substance-abuse
4  facility?
5      A.    We have 60 beds.  And naturally,
6  when women have the problem -- we're
7  certified by the state for 60 beds.  But when
8  women have -- well, no, I think they changed
9  it to 38.  When women have problems with the
10 crime and that kind of thing, most of the
11 time, it's because of substance abuse.  And
12 so, naturally, we address substance abuse.
13     Q.    So the difference between what
14 you do and the foundry is they don't take
15 women and children?
16     A.    Right.
17     Q.    They just take women?
18     A.    They only have -- they have a
19 small -- they take women and men.  We do not
20 take men.
21     Q.    And how about Bradford Services?
22     A.    Bradford is an in-patient, and
23 Bradford does not deal with crime or

Page 64

1  anything.  It's like a 30-day treatment
2  center.  Our treatment facility that is
3  certified -- but it was not certified in
4  those years.  Our treatment facility is
5  90-day.
6      Q.    When you say "certified," you're
7  referring to certified by the State of
8  Alabama?
9      A.    Yeah.
10     Q.    When were y'all certified?
11     A.    Early 2008, I believe.
12     Q.    What are -- what are your duties
13 and responsibilities?
14     A.    Predominantly, it's vision, the
15 general direction of the center.  And I work
16 with the board.  And -- you know, I stay busy
17 about 18 hours a day.  That doesn't sound
18 like I should be busy 18 hours a day, but I
19 am.
20     Q.    You're down there working long
21 hours?
22     A.    Yeah.  A lot of problems in this
23 world.

Page 65

1      Q.    When you say give general
2  direction at the center, what do you -- what
3  do you mean by that?
4      A.    Well, you know, where it's going,
5  how it's getting there, working with the
6  churches, that kind of thing.
7      Q.    Do you work with the client
8  representatives?
9      A.    Not much.
10     Q.    Who works with the client
11 representatives?
12     A.    Melinda.
13     Q.    Do -- do you ever give
14 instructions to the client representative?
15     A.    Occasionally.
16     Q.    If I understand you, you sort
17 of -- do you set the program?
18     A.    I'm trying to -- no, not anymore.
19 It's set.
20     Q.    Who set it originally?
21     A.    Originally, I would say I
22 started -- I mean, I started the program in
23 the direction that it needed to go, but I

17  (Pages 62 to 65)

Page 66

1  don't really do that anymore.
2      Q.    Has it changed from the direction
3  you originally set?
4      A.    Oh, yes. We -- we have grown.
5  It's much, much -- well, I think it's better.
6  I mean, we try to be better every day.
7      Q.    Do folks run changes by you
8  before they are implemented?
9      A.    Sometimes. Most of the program
10 things now go by Melinda or Lindsay. Lindsay
11 is as active in it as Melinda.
12     Q.    And Lindsay -- say that again.
13     A.    Lindsay is as active as Melinda.
14     Q.    And Lindsay is who?
15     A.    Lindsay Lee.
16     Q.    That's the lady you told me about
17 earlier?
18     A.    Right.
19     Q.    I want to be sure I understand
20 the organization of the Lovelady Center. We
21 have you as executive director, and then
22 underneath you are two directors. Who is
23 underneath those two directors?

Page 67

1      A.    Gosh. A program director.
2  There's a CFO. There's an education
3  department. There's a kids -- there's a
4  child care department. There's a drug rehab
5  department. And under the program director
6  are client reps. And then there's operations
7  and cooks and cleaners and child care
8  workers, front desk people, transportation
9  people. I mean, it's -- it's a lot.
10     Q.    Anybody report directly to you?
11     A.    Melinda and Lindsay.
12     Q.    Who's the CFO?
13     A.    Rosie Mullin.
14     Q.    And you mean chief financial
15 officer? Is that what you mean when --
16     A.    Yeah.
17     Q.    Rosie?
18     A.    Mullin, M-U-L-L-I-N.
19     Q.    Was she there during June 2006
20 through August 2007?
21     A.    I don't remember. Part-time
22 probably. I mean, for some of that time.
23     Q.    Who would have been the person

Page 68

1  who made decisions about whether or not
2  client representatives received overtime
3  payments for hours worked over 40 hours a
4  week?
5      A.    It never occurred to me. Nobody
6  ever even mentioned it. I guess you would
7  have to say me or Melinda.
8      Q.    Did -- the client
9  representatives, what were their duties?
10     A.    They -- the client
11 representatives are like a lifeline between
12 the directors and the clients. They are
13 assigned so many women, and then they kind of
14 do with them what they need to. We really
15 don't -- we leave most of it up to them, as
16 long as the women attend classes and that
17 kind of thing.
18     Q.    Well, when you -- they're
19 assigned a number of women. How many women
20 are they typically assigned?
21     A.    Anywhere from 15 to 30, depending
22 on how much trouble each one of their women
23 are. Like some -- if you have a client load

Page 69

1  of 20, probably five of them are a lot more
2  trouble than the others. You know, it all
3  depends on where the woman formerly comes
4  from.
5      Q.    And what exactly are the client
6  representatives supposed to do?
7      A.    They're like a mentor to the
8  clients. Most of our clients have never had
9  a -- a decent life or they have been on
10 drugs. And so we try to get client reps that
11 understand that and that are -- that can work
12 with them.
13     Q.    How do they work with them?
14     A.    They love them. They take care
15 of them. They help them mentor, to show them
16 how to take care of their kids, to show these
17 women how to live. They get them up. They
18 show them how to have structure in their
19 lives.
20     Q.    How do the client representatives
21 learn what they are supposed to mentor about?
22     A.    Well, we have counselors that
23 come in that train them. And we teach them,

18 (Pages 66 to 69)

Page 70

1 and many of them have been through programs
2 themselves. They're drug tested.
3    Q.    Do they have employee contracts?
4    A.    No. They have independent
5 contracts.
6    Q.    What is an independent contract?
7    A.    It is a contract giving them
8 pretty much the freedom to handle their
9 clients like they need to.
10    Q.    They don't have any restrictions
11 on how they handle their clients?
12    A.    Like what?
13    Q.    That's what I'm asking you. They
14 do or they don't have restrictions?
15    A.    Well, we don't want them to do
16 drugs, and we don't want them to go places,
17 and we don't want them to -- we don't want
18 the client representative to become too
19 friendly. We want them to maintain a
20 relationship with them but not overly -- not
21 overly friendly.
22    Q.    Do they have an office --
23    A.    Yes.

Page 71

1    Q.    -- at the Lovelady Center?
2    A.    Yes.
3    Q.    Each client rep has an office?
4    A.    Yes.
5    Q.    Who's the person that -- that
6 gives instructions to the client reps?
7    A.    Lindsay and Melinda.
8    Q.    Are those instructions written
9 down?
10    A.    Yes. We have -- we have manuals.
11    Q.    Did you have manuals back in the
12 year -- approximate year from June 2006 to
13 August 2007?
14.    A.    Yes.
15    Q.    What are the hours these client
16 representatives are supposed to work?
17    A.    Most of them -- we have
18 meditation every morning, and most of them
19 get there for meditation. And most of
20 them -- they have flexibility to leave in the
21 daytime and do what they need to be. Some of
22 them work later. Some of them -- if they've
23 got a client that's coming in from work, they

Page 72

1 might be there later. They may leave
2 earlier, depending, maybe they have got kids
3 at school. It's really flexible.
4    Q.    Do you keep track of their hours?
5    A.    They do.
6    Q.    How do they keep track of their
7 hours?
8    A.    They write them down.
9    Q.    And do they give them to
10 somebody?
11    A.    Yes.
12    Q.    Who do they give them to?
13    A.    Then or now?
14    Q.    Let's start with then. Then we
15 are referring to June 2006 to August 2007.
16    A.    I think Melinda then.
17    Q.    How about now?
18    A.    Rosie.
19    Q.    And do they -- back in the time
20 that's relevant to this suit, June 2006 to
21 August 2007, did they have a time clock that
22 they use?
23    A.    No.

Page 73

1    Q.    When they leave, do they have to
2 say where they're going?
3    A.    No. Unless they're taking them
4 to court or something.
5    Q.    They don't otherwise give any
6 notice of when they come and go?
7    A.    Not as far as I know. They might
8 tell Melinda: Hey, I am going out here for a
9 while, or something like that.
10        Just -- well, in the -- in our
11 building, we are very careful about who comes
12 in and out. So if they go out the front
13 door, I'm sure they would tell the front
14 desk. Because even when I go out, the front
15 desk says: Where are you going?
16        I say: I'll be back.
17    Q.    They don't have any instructions
18 to notify the center during working hours
19 where they're going?
20    A.    Not really.
21    Q.    Back when Plaintiff Traci Jones
22 worked there, she was an hourly worker;
23 correct?

19 (Pages 70 to 73)

Page 74

1     A.    I believe so.
2     Q.    Are all the client
3  representatives still hourly workers?
4     A.    I don't know.
5     Q.    Do you -- how did you know how
6  much to pay Ms. Jones and the other client
7  representatives when she worked there?
8     A.    Well, I don't guess I do know. I
9  know what I was hoping that we could afford,
10  so I think -- and it's pretty standard, you
11  know. The other -- the other transitional
12  houses that are similar, not just like it,
13  they make anywhere from 7 to $10 an hour.
14     Q.    And my question is: If you don't
15  know when they're coming and going and they
16  are paid hourly --
17     A.    They write it down. They tell
18  us.
19     Q.    So you take what they write down
20  as being correct and you pay them that many
21  hours?
22     A.    Yes.
23     Q.    Per hour times those hours;

Page 75

1  right?
2     A.    Yes.
3     Q.    Client representatives, when
4  Ms. Jones was there, have any weekend duty
5  responsibilities?
6     A.    Yes. Most rehab centers -- and
7  this is what we did. I based it on what
8  everybody else did. We paid $200 for a
9  weekend. We still do that. And on the
10  weekend -- like, for instance, Traci brought
11  her kids with her on the weekend, and she
12  could go -- she had the flexibility to come
13  and go on the weekends. She went out to eat
14  with her family. She -- she cleans her
15  church on the weekend for money. She took
16  girls to the church with her. And she would
17  spend the night. Her kids spent the night.
18  So there is a lot of flexibility with that.
19  But we paid $200 for a weekend, come and go,
20  do what you want to, but you watch them. But
21  it's not mandatory. They just do it if they
22  want to.
23     Q.    Who is there on the weekend other

Page 76

1  than the client representative?
2     A.    The desk people, the security
3  people. Me half the time. Melinda more than
4  half the time. The intake department
5  generally has somebody in it. So it's no big
6  deal if the client rep needs to leave. Now,
7  we call them house mothers on the weekend,
8  and I think we did that, too, then.
9     Q.    Are there times when you and
10  Melinda are not there on the weekends?
11     A.    Yes.
12     Q.    Is there a requirement that there
13  be management personnel there on the weekends
14  when you and Melinda are not there?
15     A.    The house mother would be.
16  However, because the front desk and security
17  is there, they can leave and go.
18     Q.    So are you saying the times Ms.
19  Jones was there, there could be times when
20  you were gone, Melinda was gone, and the
21  client representative gone, and so the person
22  in charge would be the desk person and
23  security people?

Page 77

1     A.    Yes. But I mean, we're all on
2  call, and, like I say, Hob Hill is right by
3  the center.
4     Q.    What's right by the center?
5     A.    Hob Hill is right --
6     Q.    Okay.
7     A.    -- close to the center --
8     Q.    Your home.
9     A.    -- so it's no big deal for me to
10  leave and come back.
11     Q.    If you're called?
12     A.    If I'm called. And I'm called
13  plenty.
14     Q.    The -- the client
15  representatives, when they work weekends, did
16  they have any duties?
17     A.    Drug testing, if someone seems
18  to -- to need it. And just kind of be there
19  in case somebody needs something.
20     Q.    Are any of these ladies that are
21  there -- and I refer to them as clients. Is
22  that what you refer to them as?
23     A.    Clients or residents, yes.

20  (Pages 74 to 77)

Page 78

1    Q.    Are any of the clients on any
2 treatment programs where they require
3 medications?
4    A.    Yes.  And -- yes.
5    Q.    Who handles the medications?
6    A.    We have an RN.
7    Q.    What is her name?
8    A.    Linda Goble.
9    Q.    Was she there back in June 2006?
10    A.    Yes, I believe so.
11    Q.    Is she still there?
12    A.    Yes.
13    Q.    Do you know if she's a licensed
14 RN?
15    A.    Yes, she is.
16    Q.    And you had earlier mentioned a
17 counselor who trains the client reps.  Who is
18 that?
19    A.    Doctor -- well, there's a lot
20 now.  Back then I believe Dr. Semon met with
21 them.  Joe Medina met with them.  I don't
22 remember who else.
23    Q.    Now, Linda Goble, the nurse, she

Page 79

1 gives out the medications?
2    A.    Yes.
3    Q.    Does she work weekends?
4    A.    No.  Occasionally.
5    Q.    Who gives out medications on the
6 weekends?
7    A.    I don't know back then.  I don't
8 remember.  Now, we have two LPNs that
9 alternate.
10    Q.    Who would know back at the times
11 relevant to this lawsuit?
12    A.    Melinda and Lindsay, Shea.
13    Q.    You mentioned a board.  Tell me
14 about the board of directors.
15    A.    It's a governing board of
16 directors.
17    Q.    How many people are on the board?
18    A.    Fourteen now.
19    Q.    When did you -- when did you
20 start having the board of directors?
21    A.    From the beginning.
22    Q.    From the very beginning?
23    A.    Yeah.

Page 80

1    Q.    When you first started and you
2 had a few ladies staying at your house, you
3 had a board of directors from the beginning?
4    A.    From the time we became a
5 501(c)(3), we had a board of directors.
6    Q.    Do you know who's on the board?
7    A.    Then or now?
8    Q.    Let's start with now.
9    A.    Yes.  But I probably can't just
10 rattle off their names.
11    Q.    Tell me who you recall.
12    A.    Joe Medina, Richmond Flowers,
13 Diane Flowers, Chris Dagle.
14    Q.    Chris?
15    A.    Dagle, D-A-G-L-E.  Carroll
16 Duncan.  Carroll Duncan might have been on
17 there then, the city counsel.  Dave Morrison,
18 Judge Andre Sparks.  How many is that?
19    Q.    I haven't been counting.
20    A.    I think I may be getting them
21 all.  Jim Henderson.
22    Q.    Do you recall anybody else?
23    A.    No.  Oh, at that time, Dave

Page 81

1 Anderson and Michael Semon, Dr. Michael
2 Semon.
3    Q.    And were all those people on the
4 board at that time?
5    A.    No.
6    Q.    Okay.  Which of those you named
7 were not on the board at the time, the time
8 that Traci Jones was there?
9    A.    I don't remember.  Joe Medina,
10 Jim Henderson, Dave Anderson.  I think Gail
11 Stephens, the accountant, Gail Stephens,
12 Carroll Duncan, probably.  She was Carroll
13 Reynolds then.
14    Q.    Okay.  Joe Medina and Dr. Semon,
15 they're employees of Freedom Rain; is that
16 correct?
17    A.    No.
18    Q.    They are not?
19    A.    Just independent counselors who
20 give to the ministry of their time.
21    Q.    They don't charge anything --
22    A.    No.
23    Q.    -- to do their consulting work?

21  (Pages 78 to 81)

| Page 82 | Page 84 |
|---|---|

**Page 82**

1    A.    No.
2    Q.    I think you mentioned Dr. Semon
3 would come in and talk to the client
4 representatives?
5    A.    Yes.
6        (Recess taken.)
7    Q.    Who within Freedom Rain keeps the
8 books?
9    A.    Rosie Mullin.
10    Q.    You mentioned Rosie before. But
11 I'm not -- did you tell us what her title
12 was?
13    A.    She's the CFO.
14    Q.    Okay. She's the CFO. Who --
15 back when Traci Jones worked for Freedom
16 Rain, who set your salary and benefits? Who
17 established your salary and benefits?
18    A.    Who, mine?
19    Q.    Yes.
20    A.    Probably the board. I would go
21 over it with them, and I would ask for what I
22 needed. But we didn't really get -- I didn't
23 get paid so -- you know, it was -- I didn't

**Page 83**

1 get paid much.
2    Q.    My question is: Who -- who sets
3 your -- what you are supposed to be and what
4 your benefits are supposed to be?
5    A.    I don't think it was set back
6 then. And Jeff still had that company,
7 Excell, and while Jeff had Excell, I didn't
8 worry much about the pay from there.
9    Q.    Who set the -- what was supposed
10 to be the salary and benefits of -- of your
11 daughter when Traci Jones worked there? I'm
12 referring to --
13    A.    The board.
14    Q.    And did the board also set the
15 salary and benefits of what your other
16 relatives who were back then, other relatives
17 that worked for Freedom Rain back then?
18    A.    No. Actually, Miranda got the
19 same as the other client reps. She was a
20 client rep. So we set that. And she got the
21 same as everybody else. And Christian's
22 would have been set by the board because
23 Christian was there when FIMA was there.

**Page 84**

1    Q.    And why wasn't yours set by the
2 board?
3    A.    I didn't ask for one then.
4    Q.    You didn't for --
5    A.    A salary then.
6    Q.    Okay. Are you saying when Traci
7 Jones worked there, you didn't take any
8 salary at all?
9    A.    I didn't get salaries then, no.
10    Q.    How did you decide how much to
11 take?
12    A.    Well, it was much later on, and
13 the board -- Joe Medina was chairman.
14    Q.    So you're saying -- I want to be
15 sure I'm clear on this. When Traci Jones
16 worked there, you weren't paid anything at
17 all?
18    A.    Okay. I don't remember exactly
19 if I got paid anything or not from the
20 ministry. I don't -- I cannot remember if I
21 ever got anything at all. My husband still
22 owned Excell Financial, and he bought and
23 sold real estate and he did fine. So I was

**Page 85**

1 not worried about getting money then.
2    Q.    I understand you might not be
3 worried about getting money. My question is
4 --
5    A.    I worked for free for months and
6 months and months and months and months.
7    Q.    And my questions are simple.
8 When Traci Jones worked there --
9    A.    I don't think I got --
10    Q.    -- did you work for free?
11    A.    Most of the time. I may have
12 gotten a check here or there. I don't
13 remember. I don't think so. We just let
14 the -- we just let anything accrue. And I
15 think it was like -- I don't even know if I
16 let anything accrue back then. I'm sorry. I
17 don't remember.
18    Q.    What is --
19    A.    Money was not the motivating
20 factor then.
21    Q.    -- back when Traci Jones worked
22 there, how were decisions made to -- to buy
23 things for the center? What were your

22  (Pages 82 to 85)

Page 86

1  policies and procedures of Freedom Rain
2  Ministries?
3      A.   For instance -- I don't know what
4  you're talking about.
5      Q.   A minute ago you mentioned there
6  was a lien based on air condition work.
7      A.   No, that lien was just for now.
8  We -- they -- we were getting our air fixed.
9  You filed this lawsuit.  We lost our grant.
10 So they billed us for the -- they billed us
11 for what they had done.  But this is way
12 after Traci left.
13     Q.   I understand.  But my question is
14 more general than that.  You have expenses
15 running the center?
16     A.   Yes.
17     Q.   The Freedom Rain; right?
18     A.   Yes.
19     Q.   You've got all kinds of bills for
20 water or electric, painting, plumbing,
21 whatever; right?
22     A.   Okay.  Yes.  Most of that is --
23 is called procured.  We have a department and

Page 87

1  people call and they get things donated to us
2  and we fix what we can fix.  And we have two
3  maintenance guys.
4      Q.   If you had a large expense -- and
5  I'm talking, again, back when Traci worked
6  there -- who has to approve paying for that,
7  or if you have capital improvement and you
8  want to buy something, who has to approve
9  that?
10     A.   Again, there have been no capital
11 improvements when Traci was there that I can
12 remember.  There has not been funding for
13 that kind of thing.  I don't -- I can't think
14 of anything that we bought major.
15     Q.   Well, if you had a major expense
16 or capital improvement other than when Traci
17 was there, how would -- how would you get
18 that approved?
19     A.   We would try to get it procured
20 so we wouldn't have to pay for it because
21 there is no money to pay for it.  Like the
22 elevators, the elevators broke.  We talked to
23 the elevator -- Melinda talked to the

Page 88

1  elevator company and they let us make
2  payments on getting the elevator fixed
3  because we have to have one working elevator.
4      Q.   My question is:  Who has
5  authority to spend funds?
6      A.   Rosie, Melinda, or me, or Bob.
7      Q.   Who is Bob?
8      A.   Prescott.  Or Lindsay.
9      Q.   Okay.  Now, are there -- are
10 there limits to the amount you could spend
11 for Freedom Rain?
12     A.   Yes.  Because we don't have the
13 money.
14     Q.   I understand.  Money is always a
15 limitation for all of us.
16     A.   Yeah.  I mean, we're limited.
17     Q.   Aside from the amount of money, I
18 mean, are there -- are there limits where you
19 have to get approval from somebody else other
20 than yourself?
21     A.   Mr. Talty, if we have anything to
22 buy, any time we have to buy, we try to get
23 it donated.  If we cannot get it donated and

Page 89

1  we have to buy it, then we -- we all try to
2  figure out:  Okay.  Can we buy this?
3      Q.   Okay.  But my question is --
4      A.   I would give the final approval.
5  Melinda, Bob, Lindsay --
6      Q.   Let's take Melinda, for example.
7  If she needed to buy something for Freedom
8  Rain, is there an amount of expenditure above
9  which she must get your approval?
10     A.   I would say if it's over a
11 thousand dollars, she would need to get with
12 me.
13     Q.   Okay.  Is that -- is there a
14 written policy or procedure on it?
15     A.   No.
16     Q.   Do you have any limit above which
17 you must go get somebody's approval if you
18 need to make that expenditure and the funds
19 are available?
20     A.   That is such a pipe dream.  I do
21 not know.  I can't even imagine.  That would
22 be so awesome because there is so much I
23 would love to buy.  I would go to the board

23 (Pages 86 to 89)

Page 90

1  if it needed to be something big. But if a
2  plumbing thing breaks down and we know we
3  have to have $300 for plumbing, we just get
4  it.
5     Q.   Have you ever gone to the board
6  for the approval of any expenditure?
7     A.   Major expenditure?
8     Q.   Of any expenditure.
9     A.   Yes.
10    Q.   Okay. What was it?
11    A.   The board wanted -- they -- we
12 were trying to get a consultant to come, and
13 we went to the board for the board to do it
14 and try to raise the money. But we never
15 did, so we didn't get it.
16    Q.   When was that?
17    A.   About six months ago.
18    Q.   Any other times when you went to
19 the board --
20    A.   Not that I can think of. I'm
21 sure that there are. I just can't think of
22 them.
23    Q.   Are board meeting minutes kept?

Page 91

1     A.   Yes.
2     Q.   How often does the board meet?
3     A.   Every other month, bi-monthly.
4     Q.   Earlier I was asking you about
5  the nurse and the medications. Does she
6  distribute any controlled substances?
7     A.   If we have a lady, for instance,
8  that is in the center and her addiction was
9  Cocaine and she had surgery, she may allow
10 her to take Lortabs for a day or two. But we
11 do not let our women have controlled
12 substances.
13    Q.   Do you -- do you keep Lortabs on
14 the site?
15    A.   I don't -- I don't think so.
16    Q.   No other substances that the
17 nurse might distribute to clients that would
18 be controlled?
19    A.   Not to my knowledge. I mean,
20 there may be some instances where Linda talks
21 with the doctor or something like that.
22 That's not my department.
23    Q.   Does -- strike that.

Page 92

1        You mentioned earlier that you
2  had -- you or your husband had lent Freedom
3  Rain some money; correct? Do you know what
4  the terms of that loan were?
5     A.   No, I don't.
6     Q.   I take it from the statements you
7  have made, Freedom Rain has never had any net
8  earnings on an annual basis?
9     A.   No, sir.
10    Q.   When a client comes to live with
11 y'all, do you charge her for anything?
12    A.   Not in the -- not in the first.
13 After she's been there a month or so, we help
14 them get a job and they are supposed to pay
15 fees, a hundred dollars a week at that time
16 for -- the fees are for room and board. It's
17 to teach them how to manage their money. But
18 sometimes they don't -- judges will say they
19 can't work or something like that, so they
20 will have to work in the building.
21    Q.   So they -- they're responsible
22 for paying a hundred dollars a week for their
23 room and board?

Page 93

1     A.   And transportation to go to work,
2  their food, all of that.
3     Q.   Does that hundred dollars a week
4  cover anything else?
5     A.   The program, classes.
6     Q.   So basically, it's a source of
7  operating funds for Freedom Rain?
8     A.   Well, it should be, yes.
9     Q.   Okay. And you say there are
10 instances where they can't pay?
11    A.   Many times they can't pay. And
12 sometimes these women that we have, you know,
13 they've never had responsibility before. We
14 have to teach them. And we have classes for
15 budgeting and all.
16    Q.   Do you know what percentage of
17 them, approximately, are able to pay the
18 hundred dollars a week?
19    A.   It's better than it was then. I
20 mean, I don't know. My goal would be a
21 hundred percent, but we are a long way from
22 it.
23    Q.   It should be. But do you have

24 (Pages 90 to 93)

Page 94

1    any idea what it is? Or how much you take in
2    from -- from those charges?
3        A.    No. I'm sorry. I don't. I do.
4    It's about -- now, it's about $55,000 a
5    month.
6        Q.    You -- you mentioned food. How
7    much of the hundred dollars a week, do you
8    think, goes for food?
9        A.    We have our food down to just
10   really not -- it's -- it's about -- now -- I
11   don't know what it was then -- it's about
12   $3,000 a week that we pay for food. It's
13   about what it is now, $3,000 a week.
14       Q.    Do you have any idea what it was
15   back when Traci Jones worked there?
16       A.    No.
17       Q.    Makes sense that it would
18   correspond with about as many ladies as you
19   had there?
20       A.    Yes.
21       Q.    Average.
22       A.    Uh-huh.
23       Q.    Do you have any other sources of

Page 95

1    funds other than the hundred dollars a week
2    and donations?
3        A.    Yeah. Donations. Now, it's 130
4    a week. We have some children we keep from
5    the outside in the day care. We get food
6    stamps.
7        Q.    Okay. Anything else?
8        A.    Grants.
9        Q.    Anything else?
10       A.    We're getting appropriation.
11       Q.    Anything else?
12       A.    Churches.
13       Q.    That's a donation; right?
14       A.    No. It's a little different
15   because they partner with us. But they
16   didn't then. So it's a little different.
17   Somehow, somewhere we come up with it.
18       Q.    Anything else, or are those all
19   the sources that you can think of?
20       A.    Then or now?
21       Q.    Let's start with then --
22       A.    No.
23       Q.    -- when Traci was there.

Page 96

1        A.    No. And it was a hundred dollars
2    a week then.
3        Q.    Right. How about now?
4        A.    Yeah. Now, we have a teeny-tiny
5    flea market, like a thrift store that --
6    because we have a lot of donations. And
7    we're also trying -- well, we don't have
8    anything else. I am so used to giving my
9    plans. I wasn't thinking. That's all we
10   have.
11       Q.    Are there any charge -- is there
12   any charge for drug tests?
13       A.    $10. We are going to have to go
14   up on that because the drug test now costs
15   ten.
16       Q.    Well, I'm going to ask you again:
17   Are there any other sources of funds?
18       A.    Then or now?
19       Q.    Let's start with then, and then
20   we'll go to now.
21       A.    The day care, the client fees.
22   The drug test is not revenue. It's just kind
23   of in and out.

Page 97

1        Q.    You mean it just covers the cost
2    of the drug tests and no more?
3        A.    Yeah. I think -- I think, back
4    then, the drug test was eight; now they're
5    12.
6        Q.    Any other sources?
7        A.    You got all that.
8        Q.    The client fees, that's a hundred
9    dollars per week back then?
10       A.    Uh-huh.
11       Q.    How is --
12       A.    We have vending machines. We get
13   money from them. Washers and dryers.
14   Because we -- the washers and dryers kept
15   breaking, so we have coin-operated but -- and
16   we get a little bit of that. But I don't
17   think we had that then.
18       Q.    Earlier you mentioned the lawsuit
19   was filed and you lost a grant?
20       A.    Yeah.
21       Q.    Who -- who was the grant
22   requested from?
23       A.    We got a federal home loan grant

25  (Pages 94 to 97)

Page 98

1  to work on the building.
2      Q.  I guess I'm curious.  You lost
3  it?  You had it and then you lost it?
4      A.  Yes.  Because of this lawsuit.
5      Q.  How do you know it was because of
6  this lawsuit?
7      A.  They sent me a letter.
8      Q.  What did the letter say?
9      A.  It said that based on having a
10 lawsuit filed against us, and -- that's when
11 -- I mean -- and they just said they would
12 not deal with us no matter how big the
13 lawsuit was.
14     Q.  They give you any other reason?
15     A.  No.
16     Q.  Do you have any knowledge of your
17 -- of the -- of the earlier federal case
18 which we talked about, which is mentioned in
19 this Plaintiff's Exhibit 1, the release from
20 the U.S. Attorney's Office?  Do you have any
21 knowledge of whether or not that has been
22 reopened or not?
23     MR. DONALDSON:  I'm going to

Page 99

1  object.  It is not reasonably calculated to
2  lead to discoverable evidence.  I am going to
3  instruct she doesn't have to talk about it.
4      MR. TALTY:  Y'all raised the
5  issue that a grant was lost because of this
6  lawsuit.  And I'm just following up on the
7  door that is now open.
8      MR. DONALDSON:  Well, I didn't
9  open any such door, and I am instructing her
10 not to talk about it.  We have wasted enough
11 time here.
12     MR. TALTY:  Well, her co-counsel
13 did.  But you are instructing her not to
14 answer; correct?
15     MR. DONALDSON:  The record speaks
16 for it.
17     MR. TALTY:  You are instructing
18 her not to answer the question; correct?
19     MR. DONALDSON:  I'm not going to
20 answer your questions.  You direct the
21 questions to the witness, not to me.
22     MR. TALTY:  I'd like to.  I sure
23 would like to.

Page 100

1      MR. DONALDSON:  Nobody's stopping
2  you.
3      MR. TALTY:  I thought somebody
4  just did.
5      MR. DONALDSON:  You can ask her
6  anything you want to.  I'm just instructing
7  her not to answer questions about whether
8  there is some criminal investigation going
9  on.
10     Q.  Do you know if the previous case
11 has been reopened?
12     A.  I don't know whether the case has
13 been reopened.
14     Q.  The grant that you mentioned, you
15 said it was a federal home loan grant.  What
16 was the purpose of that grant?
17     A.  Renovation of the building, I
18 believe, is how it was written.  You couldn't
19 spend -- the money could only be spent on the
20 building.  But, I mean, we need a roof.  We
21 need air conditioning.  We need a boiler.
22     Q.  A lot of charities keep track of
23 the percentage of donations that actually is

Page 101

1  used to benefit the folks that the charity
2  services; in your case, your clients.  Do you
3  know what percentage of the amount, the
4  revenue you take in, is actually used to
5  benefit the clients?
6      A.  Bob Prescott would know that.  I
7  -- it would -- I mean, there is no money
8  taken out except for --
9      Q.  But you never --
10     A.  -- salary --
11     Q.  But you've never seen a figure
12 for what percentage of your revenue --
13     A.  Yeah.  Bob has it.
14     Q.  Do you recall what it was?
15     A.  No.  I mean, he took the
16 marketing out, and everything else was in.
17 And it was like some -- I don't know.
18     Q.  Do you know what percentage the
19 overheads of -- cost of running Freedom Rain
20 are as to a percentage of the revenues you
21 receive?
22     A.  Yeah.  Not nearly enough.  Our
23 cost per month is about 229 to $243,000 now.

26 (Pages 98 to 101)

Page 102

1    I don't know what it was then. And donations
2    are -- are really down. We haven't lost any
3    donors, but the amount they give is down.
4    And our, you know, grants are down. And the
5    econ -- and the bills are up, so a lot of
6    bills are behind. But we are visiting, and,
7    hopefully, we will be able to survive. I am
8    believing that.
9        Q.    You mentioned appropriations.
10   What are those?
11       A.    You know what? I really don't
12   know.
13       Q.    And you mentioned partnering with
14   churches. Can you tell me about that?
15       A.    The churches give a monthly
16   amount.
17       Q.    Is that to place some of their --
18   are their clients from those churches?
19       A.    No, no, no, no, no, no. Churches
20   come in now and do -- not then -- but they do
21   at lot of volunteers. People come. They
22   volunteer. And they will maybe give -- a
23   little church may give $200 a month. A big

Page 103

1    church may give a thousand a month.
2        Q.    And you hold some services at
3    Freedom Rain; correct?
4        A.    Yes. Every single day, every
5    Wednesday, two times on Sunday, and countless
6    other little meetings.
7        Q.    Are the client representatives
8    required to attend those?
9        A.    No. They -- most of the client
10   reps go to other churches.
11       Q.    At the time Traci Jones was
12   there, was she required to attend any
13   services?
14       A.    Not unless she was working that
15   day. She went to church in Pinson.
16       Q.    What -- what days of the week
17   were her assigned days to work?
18       A.    Well, if she wanted to work on a
19   weekend, she would work on a weekend.
20   Otherwise, just Monday through Friday.
21       Q.    So Monday through Friday, she was
22   required to attend services at Freedom Rain?
23       A.    She was -- she was supposed to

Page 104

1    make sure her women were in there. And, you
2    know, it's in the morning. It's 30 minutes.
3    Most all of us want to go. Traci never said:
4    I don't want to go. So I think she was
5    probably there most days, but I didn't really
6    check.
7        Q.    Ms. Spahn, my question is simple:
8    Was she required to go?
9        A.    Mr. Talty, my answer is not going
10   to change. I do not make someone go to the
11   services. They are -- they -- they have to
12   make sure their clients are there, so they
13   would be in the service to make sure their
14   clients are there.
15       Q.    But they are not required to go
16   themselves?
17       A.    It is not, if you don't go to
18   this service, no. But how else would they
19   know their clients were there if they weren't
20   in there?
21       Q.    I am just asking you if they were
22   required to go.
23       A.    Okay.

Page 105

1        Q.    Am I correct that Judge Bowdre,
2    to your knowledge, has not made a donation to
3    this center?
4        A.    Who?
5        Q.    Judge Bowdre, Karon Bowdre.
6        A.    No.
7        Q.    She's the judge on this case.
8        A.    Okay. No.
9        Q.    No, she has not?
10       A.    No, to the best of my knowledge.
11       Q.    I understand. Does your CFO
12   calculate that client fee of a hundred
13   dollars a week?
14       A.    It's not a hundred anymore. It's
15   130.
16       Q.    I'm talking at the time Traci was
17   there.
18       A.    No. Actually, I did that. I
19   called Alethia House to see how much they
20   charge, and they charge 125. That sounded
21   high then, so I backed ours down to 100.
22   Should have been 125. Chris knew what he was
23   doing.

27 (Pages 102 to 105)

Page 106

1    Q.   So it's not -- it's not based on
2  taking your expenditures and less donations
3  and dividing it by the number of ladies you
4  had to make up for the shortfall?
5    A.   There is no way it would reach.
6  The client fees is just a small part of it.
7    Q.   To your knowledge, did -- have
8  you or your family members taken any
9  donations, monetary or goods --
10    A.   Absolutely, positively not.
11  You're talking money?
12    Q.   I'm talking money or goods.
13    A.   Oh, no. Occasionally, if someone
14  -- if -- like if a company gave a whole lot
15  of meat or something, we would hand it out to
16  the client reps -- if our freezers wouldn't
17  hold it, we would give it to the client reps,
18  and perhaps, me or Melinda would have gotten
19  some of that.
20        Occasionally, if clothes come
21  in -- I -- I never have, Melinda never has.
22  But Miranda has probably has taken some for
23  her children or something like that because

Page 107

1  she doesn't get paid, just as I have let the
2  other people.
3    Q.   Is the board aware of that?
4    A.   Yeah. We're talking about less
5  than probably $50.
6    Q.   Do you have any policies and
7  procedures regarding taking donations of --
8  of meat or clothes?
9    A.   Yeah. What happens is we give
10  them first to the ladies who don't have
11  anything. That would be first. Second would
12  be to staff if they need it. We gave
13  staff -- we give them vouchers every once in
14  a while to get something because they're
15  drastically underpaid in my opinion.
16        And if they have children, and
17  when kids are starting to school and all, if
18  we have a whole lot of extra, we give that to
19  them. We let them stay in the day care,
20  things like that.
21    Q.   Does Freedom Rain do any
22  political lobbying, to your knowledge?
23    A.   No, not now. When Traci was

Page 108

1  there, occasionally, one of the -- someone
2  running for office, I can remember a couple
3  of times, they would ask my ladies to hold --
4  stand out in the street and wear T-shirts or
5  something to pass out something, something
6  like that. But basically, I'm afraid to do
7  any of that because probably the one I'd want
8  wouldn't get it, and then the other one would
9  be mad. So I don't do that.
10    Q.   The ladies wearing T-shirts, did
11  that occur when Traci was there?
12    A.   Maybe. I don't remember.
13    Q.   Okay. Has Freedom Rain ever
14  given any monetary donations?
15    A.   To?
16    Q.   People running for office or
17  holding office.
18    A.   No.
19    Q.   Does Freedom Rain ever provide
20  work services of any of their clients to
21  folks that have given -- given contributions
22  to the center and not -- those -- those
23  clients not been compensated for that work?

Page 109

1    A.   Say that again.
2    Q.   You mentioned earlier the
3  clients, you try to get them jobs?
4    A.   Yes.
5    Q.   Okay. Do they ever get jobs
6  where they're not compensated?
7    MR. TALTY:  Your attorney said
8  something and I couldn't quite hear it.
9    MR. DONALDSON:  I'm trying to
10  figure out what you're talking about.
11    A.   I'm a little bit confused.
12    MR. DONALDSON:  Your questions
13  don't make -- I'm not understanding your
14  questions.
15    Q.   My question is:  If I understand
16  your earlier testimony, you try to find jobs
17  for the clients of Freedom Rain; correct?
18    A.   After they're -- after we feel
19  like they're -- they're ready to go out. If
20  they're still just right on drugs, no. We
21  have to work them inside the center. Or, for
22  instance, some of the churches might need
23  cleaning, and they might go clean a church or

28  (Pages 106 to 109)

Page 110

1 something like that as good will. They have
2 community hours.
3     Q.    When they go clean a church, if
4 they have a drug problems, do they have
5 somebody that oversees them?
6     A.    Yes.
7     Q.    Okay. Who would that be?
8     A.    Whoever is at the church, I
9 guess.
10     Q.    I mean, do y'all provide anybody
11 to oversee your clients?
12     A.    Well, I mean, if we would have
13 cleaned a church with Traci, Traci would have
14 overseen them. If they go to Cahaba,
15 probably somebody at Cahaba would oversee
16 them. That's the only two I know of.
17     Q.    So it would be a client
18 representative would be with them in --
19     A.    No. Not all the time. I just
20 let them go with Traci to help Traci. I
21 don't think she paid them.
22     Q.    You had mentioned if they are not
23 ready to go out, like they're still on --

Page 111

1 still having drug problems, you'd let them do
2 something like clean up a church. My
3 question is: Who watches them while they are
4 doing that?
5     A.    Well, I don't know. I don't know
6 who. We don't just turn them loose. It all
7 depends on how they do. There might be a
8 senior person might there, might not. The
9 churches normally really help us, and these
10 girls are trying. We're not just sending a
11 bunch of derelicts out.
12     Q.    Once these ladies -- when --
13 strike that.
14         Have there been occasion where
15 you had clients go work for people that the
16 clients weren't paid for?
17     A.    I don't know. I really don't.
18     Q.    Look at me rather than your
19 attorney.
20         MR. DONALDSON: She can look
21 where she wants to. She said she doesn't
22 know.
23         MR. TALTY: Well, I think she's

Page 112

1 looking for an answer from you.
2     A.    I'm not looking for an answer.
3         MR. DONALDSON: Just -- you said:
4 I don't know. Leave it at that.
5     A.    Okay. I don't know.
6     Q.    Have you -- have you ever
7 assigned clients to do work for any of your
8 relatives for which the client was not
9 compensated?
10     A.    Are we talking then?
11     Q.    Let's talk now.
12     A.    I don't know. I don't think so.
13 I don't know.
14     Q.    Is that same answer true for now?
15     A.    Occasionally, someone will call
16 the center and say they need their house or
17 something cleaned, and the women will go.
18 Normally, the person just pays the woman. I
19 cannot think of any instance other than
20 something like that.
21     Q.    So you're saying now, after Traci
22 left, there have been instances where
23 occasionally they did work for someone where

Page 113

1 they weren't paid?
2     A.    I know for a fact this week.
3 That's what I'm thinking about. This week my
4 cousin needed two women to clean her house,
5 and she came and picked them up. And I would
6 assume she paid them. I didn't look at it.
7 I don't know. But she asked me how much, and
8 I told her to pay them something. I think $7
9 an hour is what I told her to pay them. That
10 that would be reasonable. She is my cousin,
11 and I just told her that. I don't -- I don't
12 know.
13     Q.    That's the only instance you can
14 think of?
15     A.    Yeah, I think. I mean, that's
16 all I can think of.
17     Q.    Did -- you occasionally mentioned
18 you get donations that aren't monitored. I
19 think you mentioned maybe clothing given to
20 you.
21     A.    I said I don't get any clothing.
22     Q.    No. You mentioned donations to
23 Freedom Rain is what I mean --

29 (Pages 110 to 113)

Page 114

1    A.   Yeah.
2    Q.   Of meat and clothing?
3    A.   Well, I can only remember one
4  time meat.  That's why I said that.  We got a
5  lot of meat, and we gave it -- we gave it to
6  Olivia's House.  We gave it to the foundry.
7  We gave it to the client rep.  We gave it out
8  because there was so much and we didn't want
9  it to waste.  We gave it to other nonprofits
10 too.
11   Q.   Well, that really wasn't my
12 question that I was going to, but since you
13 brought that up, who -- who gave you that
14 meat?
15   A.   Oh, Lord.  I don't have no idea.
16 I don't remember.
17   Q.   Do you remember when it was?
18   A.   No.  I just remember something
19 about it.
20   Q.   It was apparently a lot.  That's
21 why I asked.
22   A.   One of the -- sometimes people
23 will give us an unbelievable amount of

Page 115

1  something and we -- they will.  It beats all
2  I have ever seen.  And we will get so much of
3  it.  So we will send it to Olivia's House
4  down the street.  We'll send it to the
5  foundry.  The foundry does that to us.  I
6  mean, if somebody calls and they say:  We
7  have got nine pallets of chicken.
8        We'll say:  Yes.
9        And then we call the foundry:
10 Hey, come get it.
11   Q.   Do you provide folks that donate
12 that with an estimate of what the value was
13 so they can use it for --
14   A.   It's called in-kind donations or
15 like-kind.
16   Q.   Yes.
17   A.   And yes.
18   (Discussion held off the record.)
19      MR. DONALDSON:  Counsel seems to
20 not appreciate the distinction between
21 whether or not this is a nonprofit
22 corporation with whether it has 501(c)(3)
23 status, totally -- not unrelated, but

Page 116

1  distinct.  And she's a -- it's a nonprofit.
2  If it's formed under Alabama law as a
3  nonprofit corporation, it remains a nonprofit
4  corporation, even if the IRS doesn't grant it
5  501(c)(3) status.
6    A.   It is a 501(c)(3) status.
7      MR. DONALDSON:  I understand
8  that.  But he -- we've spent hours on stuff
9  that's so totally unrelated to anything that
10 could possibly be relevant.
11     MR. TALTY:  You finished?
12     MR. DONALDSON:  The only reason I
13 am pointing this out.
14     MR. TALTY:  Are you finished?
15     MR. DONALDSON:  Yeah, I'm
16 finished.
17   Q.   Okay.  Ms. Spahn, who makes the
18 valuation of in-kind gifts?
19     MR. DONALDSON:  I'm going to
20 object and instruct her not to answer because
21 it's irrelevant and not reasonably calculated
22 to lead to relevant evidence on a Friday
23 afternoon when we ought to be finishing up

Page 117

1  and getting out of here.
2    Q.   Ms. Spahn, please answer the
3  question.
4      MR. DONALDSON:  She is not going
5  to because I just told her not to.
6      MR. TALTY:  We'll have to try to
7  reach the judge at the end of the deposition
8  to see if we can get a ruling on this or to
9  see if we have to continue.
10   Q.   Are there any other -- strike
11 that.
12        Are there written policies and
13 procedures on clients working?
14   A.   Yes.  Melinda and Lindsay have
15 some -- yes.  But I don't know it all.  I
16 don't -- I don't have it before me.  They
17 have to work some so they have something
18 to -- to do if they're at the center.  I
19 don't want it if it's not good for these
20 people.
21   Q.   Ms. Spahn, I'm not sure that's
22 responsive to my question.  I think you
23 answered my question.

Page 118

1    Do -- has Freedom Rain ever paid
2  overtime to a client representative; do you
3  know?
4    A.  No.
5    Q.  Has Freedom Rain paid overtime to
6  anybody else?
7    A.  No.  I wish it would pay it for
8  me.
9    Q.  Is the sole -- sole reason that
10 Freedom Rain does not pay overtime to its
11 client representatives because they claim
12 they're exempt because they're nonprofit?
13   A.  You know what, Mr. Talty?  If we
14 had the money, I would love pay them anything
15 because they work very hard.  We don't have
16 any money.
17   Q.  Well, that's not my question.  Is
18 the reason that you don't feel like you have
19 to pay them overtime is because --
20   A.  No one --
21   Q.  -- you are exempt as a nonprofit?
22   A.  The question had never been
23 raised until you raised it.

Page 119

1    Q.  After I raised it, is the reason
2  you didn't consider paying overtime to your
3  client representatives because you feel you
4  are nonexempt?
5    A.  After you raised it, I absolutely
6  forbid anybody except for my daughter,
7  myself, Rosie, and Bob to work over 40 hours
8  a week.  They cannot work over 40 hours a
9  week.
10   Q.  Did you -- do you have any
11 defense to Ms. Jones's claims other than that
12 you regard yourself -- Freedom Rain as a
13 nonprofit?
14       MR. DONALDSON:  I'm going to
15 object.  That's not a proper question.
16 She's -- her lawyer will determine what
17 defenses she has.  You are entitled to ask
18 her what the facts are.
19   A.  My lawyer will determine what
20 defenses I have is the answer.
21       If Traci had just written me a
22 letter or come and asked.  In May, Traci
23 called and talked to Lindsay and wanted to

Page 120

1  come back to work, and then she filed this
2  lawsuit.  Had she called me, I would have
3  worked this out.
4    Q.  Now, did you originally hire
5  Traci?
6    A.  No.  Melinda did.
7    Q.  Did you have any conversations
8  with Traci before she was hired?
9    A.  I don't remember.
10   Q.  Did you ever promise Traci that
11 she was going to have insurance paid for by
12 -- by Freedom Rain?
13   A.  Yes.  And she did for a short
14 period.
15   Q.  And why was that dropped?
16   A.  Because we don't have any money.
17 Everybody's was dropped.
18   Q.  Did you maintain insurance for
19 any of the other client representatives?
20   A.  No.
21   Q.  Did you maintain insurance for
22 any of your relatives that worked at Freedom
23 Rain after Traci's insurance was stopped?

Page 121

1    A.  My daughter and me.
2    Q.  And it was stopped for everybody
3  else that was getting it?
4    A.  No.  The executive staff still
5  got it, but not -- not the client reps.  They
6  stopped for a while.
7    Q.  And who approved the decision to
8  stop insurance benefits to the client reps?
9    A.  We could not afford them.
10   Q.  Who made the decision is my
11 question?
12   A.  Either Rosie or Melinda, that we
13 could not afford it.
14   Q.  Did you have anything to do with
15 that decision?
16   A.  No.  But I supported it.
17   Q.  When you say you supported it,
18 did they bring that decision to you before it
19 was actually implemented?
20   A.  I'm sure.
21   Q.  Has Freedom Rain been involved in
22 the adoptions of any children?
23   A.  Freedom Rain, no.

31  (Pages 118 to 121)

Page 122

1    Q.    Has Freedom Rain received any
2  funds from the adoption of any children?
3    A.    Absolutely not one dime. I have
4  an adopted son.
5    Q.    I understand, but that's not my
6  question.
7          My question: Has a -- had a
8  client ever been kicked out of a Freedom Rain
9  program because they did not want to allow
10  their child to be adopted?
11    A.    Absolutely not. Our goal is to
12  reunite mothers and children.
13    Q.    I understand. I'm just asking
14  the questions. Who -- are there financial
15  statements prepared for Freedom Rain?
16    A.    Absolutely.
17    Q.    Who prepares those?
18    A.    Rosie and an independent auditor
19  named Mike that I don't recall the last name.
20    Q.    What kind of financial statements
21  do you see?
22    A.    Every month, they are all put in
23  a binder and then the auditor gets them and

Page 123

1  works on it and does the tax return.
2    Q.    Do you know the names of any of
3  those financial statements?
4    A.    Well, there would be profit and
5  loss and balance sheets.
6    Q.    Anything else?
7    A.    I think that's all there is.
8        MR. DONALDSON: By definition,
9  that's all there is.
10    A.    That's what I think. Is that a
11  trick question?
12        MR. TALTY: Let's not prompt her.
13        MR. DONALDSON: I'm not prompting
14  her. I'm just telling you what the
15  dictionary says a financial statement is.
16        Do you recall any other financial
17  statements other than the profit and loss and
18  the balance sheets.
19    A.    I don't -- we might have them. I
20  don't know what any of them would be called
21  other than that.
22    Q.    Okay. Are there any financial
23  records that show your salary and Melinda

Page 124

1  Megahee's salary?
2    A.    Yeah.
3    Q.    What would those financial
4  statements be?
5    A.    W-2s, 1099s, payroll records.
6    Q.    Where are the records of Freedom
7  Rain kept?
8    A.    7916 2nd Avenue South.
9    Q.    Any other place?
10    A.    No.
11    Q.    Do you personally -- do you keep
12  any records personally --
13    A.    No.
14    Q.    -- at your home or any place
15  else?
16    A.    No.
17    Q.    Who keeps the records at the --
18  at the Lovelady Center?
19    A.    Rosie Mullin.
20    Q.    Now, when you say -- okay. Would
21  those records include the records of the food
22  purchases?
23    A.    Of what?

Page 125

1    Q.    Records of the food purchases?
2    A.    I'm sure.
3    Q.    Where does Freedom Rain have its
4  accounts?
5    A.    Renaissance. Melinda and Rosie
6  changed, but I don't know the names of the
7  banks.
8    Q.    It's no longer at Renaissance?
9    A.    No. They have Renaissance and
10  another one --
11    Q.    Had another one?
12    A.    -- and I don't know the name of
13  it.
14    Q.    What kind -- is that a checking
15  account there?
16    A.    Obviously. There's no savings.
17    Q.    Okay. Other than those two
18  accounts, that's all of the accounts that you
19  are aware of?
20    A.    Yes.
21    Q.    And the Renaissance Bank is here
22  in Birmingham; right?
23    A.    Yes.

32  (Pages 122 to 125)

Page 126

1    Q.    And what -- what funds go into
2  those two accounts?
3    A.    Every dime we can possibly scrape
4  up every single day.
5    Q.    I understand. My question is:
6  Do you put certain types of funds in one
7  account and other sources of funds in another
8  account?
9    A.    It all goes in one account, and
10  then Rosie does it on the computer, and then
11  the computer puts it in the different
12  categories.
13    Q.    And maybe I misunderstand. There
14  is not currently two accounts; there is just
15  one account?
16    A.    You misunderstood. There's two.
17  One at Renaissance, and one at --
18    Q.    And some other bank you're not
19  sure?
20    A.    Yes.
21    Q.    My question is: When a dollar
22  donation comes in, how do you decide which
23  bank to put it in; do you know?

Page 127

1    A.    Melinda and Rosie does that. I
2  think -- you know what? I think just Rosie
3  does that. I don't think Melinda does it.
4    Q.    But you don't know the basis of
5  how she decides which bank is going to get
6  the funds?
7    A.    I have no idea.
8    Q.    Do you know if any members of
9  your family have made any withdrawals from
10  those two accounts?
11    A.    Absolutely not. None of my -- no
12  members of my family or am I on the checking
13  account. Oh, Melinda would be.
14    Q.    Do you have relatives in what's
15  called the Northern District of Alabama,
16  which is basically Birmingham North, other
17  than the folks you mentioned?
18    A.    No. I'm an only child. I have
19  very few relatives.
20    Q.    Are there any other Lovelady
21  Centers other than the one operated by
22  Freedom Rain?
23    A.    My daughter-in-law in Foley,

Page 128

1  Alabama has about six girls. There was not
2  one then, I don't think. She has about six
3  girls. But they're closing that center.
4    Q.    And who is your daughter-in-law?
5    A.    Kim Gregory, Beau's wife.
6    Q.    Kim Gregory. Do you use the same
7  accountant for your personal taxes -- oh, you
8  mentioned -- I'm sorry. You mentioned a
9  lady. Strike that.
10        What are your policies and
11  procedures regarding food stamps?
12    A.    Like all the other nonprofits, we
13  get food stamps on clients that are in the
14  center, but it's not like -- I used -- I used
15  to think food stamps were like a book that
16  you go through the grocery store. It's not
17  like that anymore. They give cards and then
18  they scan them.
19    Q.    Is that the way it was when Traci
20  was there; they gave them cards?
21    A.    That's how it's always been. It
22  is with every nonprofit.
23    Q.    And does Freedom Rain get any of

Page 129

1  those food stamp funds?
2    A.    They get them all.
3    Q.    Okay. And how do you get them?
4    A.    You swipe it in some kind of
5  card. I have never done it. But they get
6  like -- it looks like a little credit card,
7  and then they're swiped two times a month.
8    Q.    Who swipes the cards?
9    A.    Brandy McDaniel.
10    Q.    Who is Brandy McDaniel?
11    A.    She is the food stamp lady. I
12  don't know. She just works with that.
13  Because it's a full-time job, making sure you
14  get the right ones in because when someone
15  leaves, you have to take them out and have to
16  put them in.
17    Q.    Okay. Now, is Brandy McDaniel, I
18  take it, she is a Freedom Rain employee?
19    A.    Yes.
20    Q.    Who does she report to?
21    A.    Rosie. She's in the accounting
22  department. Rosie's responsible for it.
23    Q.    Do you or Melinda Megahee have

## Page 130

1    anything to do with it?
2        A.    I have never even scanned one. I
3    have never seen an application. No.
4        Q.    Let me go back to my earlier
5    questions. I'm not sure I wrote the answer.
6        Does Freedom Rain have policies
7    and procedures that were in effect when Traci
8    was there regarding food stamp cards?
9        MR. DONALDSON: What does this
10    have to do with whether your client was
11    engaged in interstate commerce?
12        Q.    Respond, please.
13        A.    I don't know. I don't know. I
14    don't -- I don't know. I don't know at what
15    point. We didn't always get food stamps.
16    They started giving them at some point. I
17    don't know when. I have never been to the
18    food stamp office. I have never swiped a
19    card. I have never filled out an
20    application. That's done in accounting. I
21    really don't even know. All I know is two
22    times a month we get some money.
23        Q.    Now, the food stamp office, you

## Page 131

1    are talking about within Freedom Rain or
2    outside of Lovelady Center?
3        A.    Outside. We don't have a food
4    stamp office. We have accounting.
5        Q.    But this Brandy McDaniel is at
6    the Freedom Rain Lovelady Center?
7        A.    Yes. But she works under Rosie
8    Mullin. Rosie knows all about the food
9    stamps.
10        Q.    Your understanding is Brandy gets
11    the food stamp cards and swipes them at the
12    --
13        A.    No. I think Rosie probably gets
14    them and Brandy swipes them because it
15    takes -- you know, it's a chore.
16        Q.    That takes place at the Lovelady
17    Center?
18        A.    What?
19        Q.    That takes place at the Lovelady
20    Center?
21        A.    Yes. At a machine. And I don't
22    know where in the Lovelady Center the machine
23    is.

## Page 132

1        Q.    Are the clients required to turn
2    over their cards to Brandy?
3        A.    Yes. That's part of the
4    program -- not to Brandy. They come in the
5    mail to Freedom Rain.
6        Q.    Okay. And they are received by
7    Rosie?
8        A.    Rosie.
9        Q.    Does Rosie give them to Brandy to
10    swipe them?
11        A.    You know what? I don't know how
12    she does it. Rosie -- Brandy may go to her
13    office. I don't know.
14        Q.    Are clients instructed to apply
15    for a food stamp card?
16        A.    We try to get everyone to because
17    it helps pay for the fees and pay for the
18    food. However, not all clients qualify
19    because some of them have a drug felony.
20    There's something about if you have got a
21    drug felony, you can't. So a good -- most --
22    a good portion of our women don't get food
23    stamps because they have a drug felony.

## Page 133

1        Q.    Do you know if -- strike that.
2        Have you ever instructed management
3    or clients that they should not tell the
4    truth on a food stamp application in order to
5    get these cards?
6        A.    Well, absolutely not. It
7    wouldn't do any good if you wanted to because
8    it's checked through the state.
9        MR. DONALDSON: Just say no and
10    be quiet so we can get out of here.
11        A.    I'm sorry.
12        Q.    Do -- it's 12:30.
13        A.    I'm fine. I'd rather finish.
14        MR. TALTY: David, are you fine?
15        MR. DONALDSON: I'm fine.
16    Deborah is fine. She is nodding her head.
17        Q.    Have you ever been the subject of
18    a civil lawsuit? Have you ever been a party
19    to a civil lawsuit?
20        A.    Yes.
21        MR. DONALDSON: You answered his
22    question.
23        A.    It's no big deal. I don't mind

34  (Pages 130 to 133)

Page 134

1  telling him.
2      MR. DONALDSON: But you answered
3  his question.
4      A.  Okay.
5      Q.  You have been? What was the suit
6  about?
7      A.  I refused to pay the rent on two
8  buildings.
9      Q.  Did you prevail or the other
10  side?
11     A.  One, I did; one, they did. Oh, I
12  got sued one time because this employee, a
13  long time ago in the tax office, wanted me to
14  pay their Blue Cross insurance, and I did not
15  pay it. And I won. I prevailed.
16     Q.  So you've previously been sued
17  three times, civil lawsuits; is that correct?
18     A.  Yeah. That's -- that's all I can
19  think of, yes, sir.
20     Q.  Are all those here in Jefferson
21  County?
22     A.  I think so, yes.
23     Q.  Does Freedom Rain prepare W-2s?

Page 135

1      A.  Yes.
2      Q.  Does it prepare them for the
3  client representatives?
4      A.  I don't know. They give them
5  1099s or W-2s.
6      Q.  Do you know which?
7      A.  No -- yes. At that time, 1099s.
8  I think now W-2s, but I don't know.
9      Q.  Do you know when you started
10  giving client reps W-2s?
11     A.  No.
12     Q.  Do you know if it was -- do you
13  have any sense; a year ago, two years ago?
14     A.  I don't have any idea.
15     Q.  Earlier we talked about Debt
16  Relief Services. Did any of your family
17  members or their spouses work for Debt Relief
18  Services before it was acquired by Freedom
19  Rain?
20     A.  Yes. Kim Gregory, Beau's wife.
21     Q.  And she went to work for Freedom
22  Rain after she -- after Debt Relief Services
23  was acquired?

Page 136

1      A.  No. She just went to work after
2  Freedom Rain. She didn't work for Freedom
3  Rain. She just started the Lovelady Center
4  in Foley.
5      Q.  Do you know who the major food
6  suppliers are for Freedom Rain clients?
7      A.  I have no idea -- yes. I think
8  SYSCO.
9      Q.  When clients leave, what happens
10  to their food stamp cards?
11     A.  It all depends on when they leave
12  and how it -- how it works. They --
13  normally, they transfer it to where they're
14  going or -- we are not allowed to scan them
15  after they leave. So I don't know what --
16  they have to re-apply wherever they go if
17  they can apply for food stamps. Our goal is
18  to help them where they don't have to do
19  that.
20     Q.  Does Freedom Rain destroy their
21  cards when they leave the center?
22     A.  No. They are not good in the
23  machine anymore. I imagine they destroy

Page 137

1  them. I don't know.
2      Q.  How -- how would the state know
3  that they've left? Does Freedom Rain inform
4  the state the client has left?
5      A.  When a client leaves, they either
6  are going somewhere else so they would want
7  their food stamp card or whatever they are
8  doing. I mean, the clients generally notify
9  them and we do too. We just aren't allowed
10  to scan them when they leave. We have to
11  take them off their report.
12     Q.  And you're saying the machine
13  won't take them even if you tried to scan
14  them; is that correct?
15     A.  Yeah. I mean, I would imagine.
16  But I imagine -- I -- I don't know if they
17  cut up the cards or what.
18     Q.  Who would be responsible?
19     A.  Rosie.
20     Q.  Rosie would know about it?
21     A.  Yeah. Rosie knows all this.
22     Q.  Does Freedom Rain have different
23  programs, or is it one program?

35 (Pages 134 to 137)

Page 138

```
 1     A.   Different.
 2     Q.   What are the programs?
 3     A.   I went over it.  It's the drug
 4  treatment, the transitional, the child care,
 5  the education.  That's it.  The substance
 6  abuse, which is the rehab.
 7     Q.   Are the client reps trained on
 8  all those programs?
 9     A.   No.  They're not on anything but
10  the transitional.  Now, that's not how it was
11  when Traci was there because we weren't
12  certified then.
13     Q.   How was it when Traci was there?
14     A.   We just pretty much did the
15  transitional.  I don't remember how much was
16  in place when she left.  She was in, you
17  know, fairly early in the program.
18     Q.   Do you know if she was instructed
19  on how to do the transitional program?
20     A.   That would probably be all.
21     Q.   But you're not sure?
22     A.   Not positive, because I don't
23  remember when she left.  And then -- the
```

Page 139

```
 1  house --
 2     Q.   If I told you it was August 2007
 3  --
 4     A.   I still wouldn't -- that wouldn't
 5  mean anything to me.  Because when we began
 6  the program, how it is now and how -- with
 7  what the goal was the whole time, so at
 8  different times, things became certified.
 9     Q.   Do you know what department of
10  the state of Alabama does the certification
11  you are referring to?
12     A.   Mental health.  But we have our
13  certificate if you want to see it.
14     Q.   Would you provide it to -- I
15  believe you, but if you want to provide it to
16  your attorney.
17          How many employees are in the
18  staff of Freedom; do you know?
19     A.   I don't have the exact number.
20     Q.   Do you know about?
21     A.   Fifty -- 40.
22     Q.   Forty to 50 total number of
23  employees?
```

Page 140

```
 1     A.   No.  Because a lot of the girls
 2  have to work in the kitchen and all.  I
 3  really don't know.  Maybe 30.  I don't know.
 4     Q.   Thirty to 50 employees?
 5     A.   You can put -- yeah.
 6     Q.   I don't want to put words in your
 7  mouth.
 8     A.   I just don't want to mislead you,
 9  and I don't -- I don't know the number.
10     Q.   Would Rosie know that?
11     A.   Rosie would know it.
12     Q.   Does Freedom Rain employ
13  consultants?
14     A.   We have so many volunteer
15  consultants.  I can't think of any.
16     Q.   What does your husband currently
17  do for a living?
18     A.   Now he is working with Freedom
19  Rain.
20     Q.   What does he do?
21     A.   He is like -- right now, he is
22  working on a fund-raiser that we're having.
23  Sometimes he fixes the plumbing.  Just all
```

Page 141

```
 1  depends.
 2     Q.   Does he have a title?
 3     A.   No.
 4     Q.   Does he have a salary?
 5     A.   Yes.
 6     Q.   Do you know how much he's paid or
 7  supposed to be paid?
 8     A.   700 a week.
 9     Q.   At the time Traci Jones was
10  there, was he employed there?
11     A.   No.
12     Q.   Does he own any side
13  businesses --
14     A.   No.
15     Q.   -- other than Freedom Rain?  Does
16  he have any properties that you're aware of?
17     A.   He's lost them all.
18     Q.   Do you know of any instances
19  where the personal funds of a -- of a client
20  that were taken from them by Freedom Rain?
21     A.   Yeah.  I know the one you're --
22  that Traci told you about, and it's the only
23  instance.  Would you like to hear what
```

36  (Pages 138 to 141)

Page 142

1  happened?
2      Q.   Sure.
3      A.   Mayor Langford came to the
4  center.  We had a lady at the center named
5  Christi something.  I don't remember her
6  name.  And she came to the center.  And she
7  is just -- she's got about a fifth grade
8  education, and she has a daughter that was 12
9  that was raped by her uncle.  They stayed at
10  the center for months.
11         And when Mayor Langford came, he
12  gave her the -- they took up an offering, and
13  she got $400.  We kept the money in the
14  office for her and then gave it out to her.
15  Now we keep her child in the day care for
16  free and the 12-year-old goes to school there
17  for free.
18      Q.   How sure are you that the amount
19  was $400?
20      A.   I know it was 400 and something.
21      Q.   Now, at the time, did you have
22  her permission to take those funds --
23      A.   Absolutely.  And the two bankers

Page 143

1  that gave to it, I told them what we were
2  doing.  She cannot handle money, they would
3  spend it all, and the baby would not have
4  diapers.  She does not have any education.
5  She does not know how to -- it's one of the
6  saddest cases we've ever had at the center.
7      Q.   What is her name?
8      A.   Christi something.  I don't know
9  her last name.  Her daughter's name is
10  Porsche, 12-year-old raped by her uncle.
11      Q.   Has Freedom Rain facilitated any
12  adoptions in any way?
13      A.   No.  You asked me that.
14      Q.   I wasn't sure I asked it in that
15  manner.  So I wanted to be sure --
16      A.   You did.  It's not going to
17  change.
18      Q.   I just want the truth, whatever
19  that is.
20      A.   Wait a second.  What is
21  facilitate?
22      Q.   Help someone get -- someone adopt
23  a child.

Page 144

1      A.   No.  We have -- Bob Echols, the
2  attorney, is on our board.  We have had two
3  women to place their children for adoption,
4  and they were at our center.  But I had
5  absolutely nothing to do with it, nor did
6  Freedom Rain.  No money was received.
7      Q.   Are you saying Mr. Echols handled
8  that?  Or he received --
9      A.   Yes.
10      Q.   He handled that as an attorney?
11      A.   Yes.
12      Q.   Okay.  Do you know who the women
13  were?
14      A.   Kelly somebody, and I don't
15  remember the other name.  I have an adopted
16  son.  My son in Gulf Shores had an adopted
17  daughter.  And my youngest daughter has two
18  adopted children.
19      Q.   Well, did you adopt them from
20  clients of Freedom Rain?
21      A.   No.  Well, actually -- ready for
22  this -- I adopted ████████ in 2000.  And one
23  day I got a call from Tutwiler, and they sent

Page 145

1  ███████biological mother to Tut -- to us.
2  And that was hard for me to swallow, but we
3  took her and she's there.
4      Q.   At the time you adopted the
5  child, she was not at Freedom Rain?
6      A.   No.  I didn't have Freedom Rain
7  then.
8      Q.   What was her name?
9      A.   I'm not going to answer that.
10         MR. DONALDSON:  What does this
11  have to do with --
12      A.   I'm just not going to -- that's
13  my son.
14         MR. DONALDSON:  Why are we -- why
15  are we going down this road?
16      A.   I'm not going to answer anything
17  about our children.  This is -- that's
18  ridiculous.
19         MR. DONALDSON:  You're invading
20  people's privacy over --
21      A.   He's nine years old, for God's
22  sake.
23         MR. DONALDSON:  Stop.  You are

37 (Pages 142 to 145)

1  invading people's privacy over things that
2  are so beyond --
3      A.   You're not touching the kids.
4      MR. DONALDSON:  Be quiet a
5  minute.
6      A.   Okay.
7      MR. DONALDSON:  You're invading
8  people's privacy here.  And you're not even
9  beginning to touch on anything --
10     A.   Ask me about Traci doing drugs at
11 the center, Mr. Talty.
12     MR. DONALDSON:  That's not
13 relevant either.
14     MR. TALTY:  I'll listen.
15     MR. DONALDSON:  Let's stick with
16 what this lawsuit is supposed to be about.
17 Is that asking too much?
18     MR. TALTY:  Are you finished?
19     A.   I don't mind answering anything,
20 but I'm not going to answer about my
21 children, my little ones.
22     Q.   Rest assured we wouldn't do
23 anything to harm the relationship between you

1  and your children.
2      A.   I know, but it just -- it just
3  makes me nervous when you start asking about
4  his adoptive mother -- I mean his --
5      Q.   I'll just withdraw the question.
6      A.   Thank you.  I can tell you this:
7  He's the cutest kid you ever saw.
8      Q.   Most kids are cute.  All kids are
9  cute.
10          You mentioned a minute ago an
11 allegation about Traci Jones.  Do you have
12 any proof that she used drugs at the center?
13     A.   Yes.  We have drug tests.
14 Traci -- before Traci came to the center, she
15 was on --
16     Q.   My question is very simple.
17     A.   Her drug addiction --
18     MR. DONALDSON:  You asked her a
19 question and cut her off before she was
20 finished.
21     MR. TALTY:  Well, in interest of
22 time, she mentioned a number of times --
23     MR. DONALDSON:  If you're going

1  to ask her questions, at least let her
2  finish.  I'd prefer that you let her finish.
3      A.   Traci -- the reason she was a
4  good client rep is because she had had a past
5  with drugs.  Methamphetamine was her drug of
6  choice.
7          Several months before she left
8  the center, she tested dirty or positive for
9  amphetamines.  No one that's ever been on
10 drugs should have that.  She said she had a
11 prescription for it because she wanted to
12 take diet pills.  She was going through a lot
13 with her husband because he was back on
14 opiates.
15     Q.   So did -- y'all performed a drug
16 test that was positive?
17     A.   For amphetamine.
18     Q.   Okay.  And she told you she had a
19 doctor's prescription for it?
20     A.   For diet pills, that's right.
21     Q.   And diet pills could be
22 amphetamines; correct?
23     A.   Absolutely they could, but a

1  crystal meth addict should never take
2  amphetamines.  That's Rule No. 1, you never
3  go back.
4      Q.   It was -- she had a doctor's
5  prescription, though, didn't she?
6      A.   Absolutely.  But it can trigger
7  you to make you want to use drugs again.
8      Q.   Did you -- did you continue to
9  employ her after the test and after she
10 showed you the doctor's prescription?
11     A.   We talked to her a lot about it,
12 yes.  And she stayed there, but I believe
13 that that's why she was kind of scattered.
14     Q.   Do you have any evidence of drug
15 problems --
16     A.   The drug tests --
17     MR. DONALDSON:  Brenda, you need
18 to wait until he finishes his question
19 because the court reporter can't take down --
20     A.   I'm sorry.  I'm so sorry.
21     MR. DONALDSON:  Just -- when he
22 finishes, take a deep breath and then answer.
23     A.   Do what now?

Page 150

1    Q.   Are you sure you don't want to
2  take a lunch break or something?
3    A.   I'm positive. It's not that.
4  I'm just -- go ahead.
5    Q.   Do you have any evidence that her
6  husband had a drug problem?
7    A.   She told us.
8    Q.   Other than her telling your that,
9  do you have any evidence?
10   A.   We didn't go test him, but she
11  told us.
12   Q.   Did that have any bearing on her
13  employment with you?
14   A.   Yes.
15   Q.   What steps did you take?
16   A.   We just tried to help her.
17   Q.   I'm going to show you a Lovelady
18  Center Vendor Quick Report. Have you seen
19  that before?
20   A.   I have seen a lot of them, but I
21  don't know.
22   Q.   That was provided to me by your
23  attorney. Do you have any reason to doubt

Page 151

1  that that's an accurate report?
2    A.   No. It looks -- it looks fine.
3    MR. TALTY: Let's make that
4  Plaintiff's Exhibit 2.
5    (Plaintiff's Exhibit No. 2
6      marked for identification.)
7    Q.   This document, entitled
8  Acknowledgment of Independent Contractor was
9  provided to me by your attorney. Have you
10  seen that before?
11   A.   No. But that looks like one.
12   MR. TALTY: I would like to enter
13  that as Plaintiff's Exhibit 3.
14   (Plaintiff's Exhibit No. 3
15     marked for identification.)
16   Q.   I'll show you stack of documents
17  here. They all appear to be Client Rep Time
18  Sheets of Traci Jones. I'll give you a
19  chance to look at those. Those documents
20  were also provided to us by your attorney.
21   A.   Traci put a little smiley face on
22  it. Must have been the happier days, huh?
23  Yep, these are client rep time sheets.

Page 152

1    Q.   Do you have any reason to doubt
2  those are not client rep sheets for Traci
3  Jones?
4    A.   No. They are Traci's. I would
5  imagine.
6    MR. TALTY: I would like to note
7  these as Plaintiff's 4. Do you have any need
8  to attach these to the deposition?
9    MR. DONALDSON: Do whatever you
10  want as far as whether you mark them and --
11   MR. TALTY: Well, I just want
12  them to be authenticated. So I'll mark this
13  as Exhibit 4.
14   (Plaintiff's Exhibit No. 4
15     marked for identification.)
16   Q.   Does Freedom Rain issue its own
17  paychecks and stubs to its client reps, or
18  does it hire somebody to do that?
19   A.   Rosie.
20   Q.   Rosie issues them, or ask Rosie?
21  What did you mean by that?
22   A.   Yeah. Rosie does it.
23   Q.   Okay. In the complaint, you were

Page 153

1  asked whether Traci Jones started working for
2  Freedom Rain about June 2006 and worked --
3  worked there until August 2007. And I'll
4  represent to you that that factual allegation
5  of Ms. Jones was denied. Why did you deny
6  that?
7    A.   Do what?
8    Q.   In the complaint, Item 7, see
9  here (indicating), the question that's asked
10  there --
11   A.   Oh.
12   Q.   Why was that denied?
13   MR. DONALDSON: Well, since I
14  drafted the answer, I don't know that she
15  would know that.
16   A.   I don't have a clue.
17   Q.   Let me rephrase the question: Do
18  you have any reason to doubt that Traci Jones
19  worked there from --
20   A.   I don't know when she worked
21  there.
22   MR. DONALDSON: You will note
23  that it claims she worked for both

39 (Pages 150 to 153)

Page 154

1  defendants, and I will just tell you she did
2  not work for Brenda Spahn. She worked for an
3  entity.
4      MR. TALTY: I'd rather that Ms.
5  Spahn just answer it.
6      MR. DONALDSON: If you are going
7  to ask questions about what I put in the
8  answer, I'm going to tell you.
9      MR. TALTY: These are factual
10 allegations, and these are her answers.
11     A.  No. They're --
12     MR. TALTY: She served as a
13 defendant. Freedom Rain served as a
14 defendant. So these are her answers of
15 factual allegations unless you're saying you
16 didn't consult with her about those answers.
17     MR. DONALDSON: I'm not saying
18 anything. I'm telling you why I put denied
19 down.
20     A.  She didn't work for me.
21     MR. TALTY: Let -- is that a copy
22 of the complaint?
23     MR. DONALDSON: This is a -- I

Page 155

1  have -- I'm just letting her see a copy of
2  the complaint since you seem to be asking
3  questions about it.
4      MR. TALTY: I know. And I've
5  shown it to her, and I'll show it to her
6  again. I just want to be sure there
7  aren't any --
8      MR. DONALDSON: It's just a copy
9  of the complaint.
10     Q.  Item 11 of the factual
11 allegations of the complaint says Ms. Jones's
12 straight time rate was about $9 per hour.
13     A.  I don't know.
14     Q.  So it's really not denied. It's
15 that you don't know; correct?
16     A.  Right. But -- she did -- that
17 was for Freedom Rain. Not me.
18     Q.  But you don't have any reason to
19 doubt she was supposed to be paid $9 per
20 hour?
21     A.  No. I don't know. No. I don't
22 think -- she might have made that much. It
23 seems a little high.

Page 156

1      Q.  Do you have any evidence that it
2  wasn't $9?
3      A.  No. It seems a little high.
4      Q.  Are the other client
5  representatives paid less than that?
6      A.  Yes.
7      Q.  In Item 12 it says, Ms. Jones
8  began her regular work days between 7:30 and
9  8:00 a.m. and she often worked until between
10 6:00 p.m. and 6:30 but at least until 5 p.m.
11 on these days?
12     A.  I don't know. You would have to
13 check her time sheets. I have no idea.
14     Q.  Would her time sheets show those
15 times?
16     A.  She wrote it down.
17     Q.  But was she required to -- to put
18 any specific times that she worked or just
19 total hours?
20     A.  No. She was not required. I
21 mean -- she -- no.
22     Q.  Here again, I am just trying to
23 understand why -- whether --

Page 157

1      A.  She wrote her time sheet out.
2  She wrote it down. I don't know.
3      Q.  She wrote down total hours,
4  though, didn't she?
5      A.  No. She wrote down the times.
6      Q.  I'm sorry. I think you're right.
7  She does write down some times. Let me ask
8  you about these time sheets.
9      A.  I will not know. She wrote them.
10     MR. DONALDSON: Let him ask you.
11     Q.  Well, let me ask and you can
12 respond that you don't know.
13     Do you know if Ms. Jones was
14 instructed that she couldn't put down
15 overtime hours on -- on the time sheets?
16     A.  No.
17     Q.  Is that no, or you don't know?
18     A.  No, she was not instructed.
19     Q.  Do you know if Ms. Jones usually
20 had to work at her desk rather than have a
21 lunch -- a lunch break?
22     A.  Never went down there and
23 checked. She could go to lunch when she

40 (Pages 154 to 157)

Page 158

1  wanted to. I could care less. Just as she
2  might have eaten in the cafeteria and didn't
3  have to pay for it. I don't care.
4      Q.  Are you saying that client reps
5  were allowed to eat in the cafeteria and not
6  pay for the food they ate?
7      A.  The food is cooked. Sometimes
8  there's more, so she could have gotten food
9  there. I don't know what she did.
10     Q.  Isn't it true that clients
11 receive some food, but they can actually pay
12 and buy better food?
13     A.  No, not better. All the food
14 should be the same. All the food is the
15 same.
16     Q.  Well, isn't some food sold to the
17 clients and some given to the clients?
18     A.  If they wanted a hamburger
19 instead of spaghetti, they can buy a
20 hamburger if they're serving spaghetti. But
21 you can always get the spaghetti.
22     Q.  Now, were you allowed to get
23 hamburgers and these sorts of things and not

Page 159

1  pay for them?
2      A.  Who, me?
3      Q.  Yes.
4      A.  I keep a tab and I get charged
5  for them.
6      Q.  Okay. So you pay whenever you
7  got food but the clients would also have to
8  pay for it?
9      A.  Yes. If I -- if the clients paid
10 for it, then we would we would have to pay
11 for it. If the clients got it free, we would
12 get it free.
13     Q.  Would Rosie have records of that?
14     A.  Probably.
15     Q.  Do you have any knowledge of any
16 of your relatives not having to pay for food?
17     A.  No.
18     Q.  And so --
19     A.  ███████ occasionally will run in
20 the store where the stuff is and he will get
21 a Coke or something, and I'll hear about it
22 later.
23     Q.  Did -- and so you are talking

Page 160

1  about Traci eating. She is eating the food
2  that's provided, not the food that's charged
3  for extra; is that correct?
4      A.  Right. Unless she wanted it.
5      Q.  And then she would have to pay
6  for it?
7      A.  Right.
8      Q.  On No. 17 of the complaint, the
9  allegation is:  At least once a month,
10 Plaintiff Jones is required to attend a
11 one-hour prayer vigil at TLC and she was not
12 paid for the hours spent at the one-hour
13 prayer vigil. We talked about that earlier
14 in the testimony; correct?
15     A.  No.
16     Q.  Is this different?
17     A.  Yeah. I mean, I would talk to
18 you about the prayer.
19     Q.  Was --
20     A.  One weekend a month we set aside.
21     MR. DONALDSON:  Let him ask you a
22 question.
23     Q.  Go ahead and talk about it.

Page 161

1      A.  One weekend a month we set aside
2  to pray for that weekend. And I asked
3  everybody to come to the center and pray
4  for -- it didn't have to be an hour. Just
5  for any time. And so we ask people to come
6  and pray. But you know what? I would ask
7  you to pray for us. You, anybody who wants
8  to pray for us. We need all the prayer we
9  can get. But, yes, I ask them to pray.
10     Q.  So it was required?
11     A.  No, it's not required. But I
12 ask.
13     Q.  Was there any penalty if they
14 didn't?
15     A.  Probably. The penalty would be
16 having to listen to me because I thought
17 everybody should pray because we were having
18 such a hard time, and prayer is the only
19 answer. So, yeah, I would want people to
20 pray, but they were not penalized.
21     Q.  In 19, Ms. Jones alleges that she
22 often did not receive her paychecks from
23 Freedom Rain on time; is that true?

41 (Pages 158 to 161)

Page 162

1       A.      Absolutely.  Many times our
2  paychecks are late.  That's why I said we
3  couldn't afford the insurance, and that's why
4  I have to make people pay fees.  You can't
5  have it every way.
6       Q.      Was everybody's paycheck
7  withheld?
8       A.      Everybody's was late --
9       Q.      Were everybody's paycheck
10  withheld?
11       A.      -- everybody's was late.  And I
12  don't get one.  So, yeah.
13       Q.      So there wasn't a case where some
14  people got paid and some people didn't?
15       A.      Nobody singled Traci out.  As a
16  matter of fact, Traci got hers quicker than
17  most anybody.
18       Q.      So you're saying some people were
19  paid ahead of others, and Traci was one of
20  them?
21       A.      Sometimes Traci would get hers.
22  It all depends.  For instance, if the ladies
23  lived in -- if whoever worked and lived in

Page 163

1  the center, they wouldn't be so -- they
2  wouldn't need it as quick as Traci because
3  Traci worked outside the center and she
4  needed her money quicker.  But we get
5  everybody paid the second we can.
6       Q.      Okay.  So some people were not
7  paid as quickly as others based on whether
8  they lived in or outside the center?
9       A.      Right.
10       Q.      Is that correct?
11       A.      If we got in $500 and Traci had
12  come to Melinda and said:  I really need it,
13  she would have gotten it.  And when she left,
14  she got everything she was due.
15       Q.      My question is different from
16  that.  My question is -- if I am
17  understanding what you are saying -- I want
18  to make sure I get it correctly.  You're
19  saying some people were paid faster than
20  others sometimes, depending on whether they
21  work inside or outside the center; is that
22  correct?
23       A.      If they lived in the center and

Page 164

1  they didn't have any expenses, they might not
2  get paid as quickly as Traci or somebody like
3  that.  But for the most part, like you
4  wouldn't go to another week without the whole
5  week.  We're talking about a few days here.
6       Q.      All right.  Who made the
7  decision?  Who made that decision about some
8  folks --
9       A.      It wasn't an unfair decision.
10  Melinda made it -- no.  Rosie makes it.
11       Q.      Paragraph 20, it says, the
12  allegation is:  Ms. Jones was not paid time
13  and a half for all hours worked in excess of
14  40 hours per week when she worked for Freedom
15  Rain.
16       A.      It doesn't say Freedom Rain.
17       Q.      Actually, Freedom Rain and
18  yourself.
19       A.      Not me.  I don't have anything to
20  do -- I'm not Freedom Rain.
21       Q.      That's why I said Freedom Rain.
22       A.      You said defendants and you sued
23  me.

Page 165

1       Q.      I'm rephrasing a little bit since
2  you said it wasn't you.
3              Are you denying that she was not
4  paid overtime in excess --
5       A.      Nobody is, and she never asked,
6  so that will take care of 21 too.  She never
7  mentioned it.
8       Q.      To you?
9       A.      Or to Melinda that I know of.
10  Melinda never brought it to me.
11       Q.      And had it been brought to you,
12  you would have paid it?
13       A.      I would have sat down with Traci
14  and discussed it for sure.
15       Q.      What would have been the outcome
16  of the discussion?
17       A.      I would have told her never to
18  work over 40 hours.  That's what I've done
19  now.
20       Q.      Okay.  Did you ever have any
21  client reps come to you and say:  Gee, why
22  aren't we being paid overtime?
23       A.      I don't remember.  I don't think

42  (Pages 162 to 165)

Page 166

1  so.
2      Q.    Factual Allegation 23, it says:
3  Ms. Jones's primary duties did not include
4  the exercise, discretion, and independent
5  judgement with respect to matters of
6  significance. Do you contend that she was
7  able to exercise discretion and independent
8  judgment --
9      A.    Where the clients were
10 concerned --
11     Q.    -- with regard to significant
12 matters?
13     A.    -- where the clients were
14 concerned, absolutely.
15     Q.    And what source of discretion
16 could she use?
17     A.    When they went on passes.
18 Just -- you know, what classes they attended,
19 what was happening with this judge or that
20 judge. Traci went to court some.
21     Q.    Was she required to go to court
22 with clients?
23     A.    Not required. But she -- she

Page 167

1  wanted to. She liked to. We had other
2  people that could go.
3      Q.    Was she asked to go to court with
4  clients?
5      A.    I don't know if she was asked or
6  not.
7      Q.    Did -- did Freedom Rain ever
8  collect money for fines to be paid on behalf
9  of clients?
10     A.    I don't think so. I don't know
11 so. Occasionally, clients have money that's
12 on the books and they might say, because they
13 are very bad at holding on to it, they might
14 get it put in the safe or something like
15 that. I don't really know about that.
16     Q.    Why would client representatives
17 go to court with clients?
18     A.    So they don't get put in jail.
19     Q.    The client representatives do not
20 have attorneys -- appointed attorneys or
21 retained attorneys?
22     A.    Sometimes they did and sometimes
23 they didn't. Most of the time, I'd imagine

Page 168

1  they do. But sometimes the judge would want
2  to know how she's doing in a program or
3  something like that. We try our best to keep
4  them out of jail.
5      Q.    So Traci's job would be to
6  explain how they were doing in the program?
7      A.    Yeah.
8      Q.    Did she do anything else for the
9  clients in court?
10     A.    I don't know.
11     Q.    Did you ever ask her to go to
12 court with a client?
13     A.    I didn't personally. I don't
14 know if Melinda or Lindsay did. Traci
15 represented the clients very well in court, I
16 heard. I had never been with her.
17     Q.    Who are the client
18 representatives that you have working?
19     A.    Now?
20     Q.    Yes.
21     A.    Michelle Ragsdale, Melissa Bruce,
22 Quincy Beckwith, Deborah Jones, Iris Weaver,
23 Melissa Pierce, Miranda Williamson, Tammy

Page 169

1  Waldrop. That's all that I can think of.
2      Q.    Okay. Now, were there any -- any
3  of those ladies that you mentioned not there
4  when Ms. Jones worked for Freedom Rain?
5      A.    I don't remember.
6      Q.    Do you remember any that have
7  left that worked there when Ms. Jones was
8  there?
9      A.    Melissa Stuckey.
10     Q.    Anybody else?
11     A.    Nobody else that I remember.
12     Q.    Do you know a Sherry Stanridge?
13     A.    Uh-huh. She's at the center now.
14     Q.    That was my next question. Is
15 she a client, or does she work there?
16     A.    Client. She relapsed this week.
17     Q.    Is she working as well as being
18 at the center?
19     A.    No.
20     Q.    When you say she relapsed this
21 week, she went back to the center just this
22 week?
23     A.    No. She's been in and out so

43 (Pages 166 to 169)

Page 170

1 many times. She's had relapses. She's a
2 real good girl and I'd like to help her. But
3 she had a foul-up this week, so she had to go
4 downstairs.
5    Q.   Who runs the client work program
6 at Freedom?
7    A.   The what?
8    Q.   The client work program.
9    A.   What is that?
10   Q.   Well, didn't you testify that you
11 have a program where you try to find work for
12 your clients?
13   A.   Oh, you are talking about our
14 personnel.  It would be Angela Walker and
15 Melissa Pierce, and Tammy Waldrop.
16   Q.   And what titles do they have?
17   A.   Do what?
18   Q.   What titles do they have?
19   A.   Well, they're client reps.  And
20 Angela does nothing but get jobs for them.
21       (Recess taken.)
22   Q.   Ms. Spahn, have you taken any
23 statements of any potential witnesses in this

Page 171

1 case?
2    A.   Any what?
3    Q.   Statements of any potential
4 witnesses in this case?
5    A.   No.
6    Q.   Does Freedom Rain have a
7 handbook, an employee's handbook?
8    A.   Yes.  Melinda has it.
9    Q.   Do you know if Ms. Jones was ever
10 given that employee handbook when she was
11 employed there?
12   A.   I don't know.
13   Q.   Do you know if that employee
14 handbook was in effect when Ms. Jones was
15 there?
16   A.   I don't know.
17   Q.   Did you have any involvement with
18 the employee handbook?
19   A.   No.  Except for what holidays
20 that we were taking and maybe a few little
21 questions.  I don't remember.
22   Q.   Have you ever read the employee
23 handbook?

Page 172

1    A.   No.
2    Q.   Is there a management handbook?
3    A.   Yes, sir.
4    Q.   And have you read that?
5    A.   Yes, sir.
6    Q.   Do you have a copy of that?
7    A.   No.
8    Q.   Who has a copy?
9    A.   Probably Rosie, or Bob.
10   Q.   Did you have any involvement with
11 the development of the management handbook?
12   A.   Just a very general, a general
13 one.
14   Q.   My question is:  Did you have any
15 involvement?
16   A.   I don't remember.
17   Q.   Do you remember when it went into
18 effect?
19   A.   I don't remember.
20   Q.   Do you have any feel of whether
21 it was more than two years ago?
22   A.   I don't know.
23   Q.   No -- no sense at all?

Page 173

1    A.   No sense at all.
2    Q.   Is Melinda Megahee provided a
3 vehicle by Freedom Rain?
4    A.   No.
5    Q.   Are there any policies and
6 procedures regarding how the board of
7 directors operates?
8    A.   Their governing board.  They --
9    Q.   Governing board.
10   A.   Yeah.  They have bylaws.
11   Q.   Have you ever read those bylaws?
12   A.   Yeah.
13   Q.   Do you have a copy of them?
14   A.   Not with me.
15   Q.   Okay.  I mean, you ave a copy
16 back at your office?
17   A.   Yeah.
18   Q.   I think earlier your attorney was
19 saying Freedom Rain had met the requirements
20 of the state to be a nonprofit; do you recall
21 that?
22   A.   Yeah.
23       MR. DONALDSON:  I don't recall

44 (Pages 170 to 173)

Page 174

1  saying that.
2      Q.   Do you -- is Freedom Rain
3  registered with the State of Alabama to be a
4  nonprofit?
5          MR. DONALDSON: You don't
6  register with the State of Alabama to become
7  a nonprofit.
8      A.   I don't know.
9      Q.   What is the --
10     A.   Anything that's required, I'm
11 sure we have done it.
12     Q.   Do you know about any documents
13 being produced to anybody for Freedom Rain to
14 become a nonprofit?
15     A.   Say that again.
16     Q.   Yeah. Do you know of any
17 documents produced for any -- any entity for
18 the purpose of Freedom Rain being considered
19 a nonprofit?
20     A.   Well, yeah. All the time.
21 Grants, you have to produce it to grants.
22 And sometimes donors will ask for it.
23     Q.   I am asking: What did Freedom

Page 175

1  Rain do to be -- to be considered a
2  nonprofit?
3      A.   Well, God. There is mountains of
4  paperwork.
5      Q.   I am not talking about individual
6  grants because they're, if I'm
7  understanding --
8      A.   No, no. There is mounds of
9  paperwork to become a 501(c)(3).
10     Q.   Okay. Other than to become a
11 501(c)(3), documents that were provided to
12 the Internal Revenue Service, were there any
13 other documents provided to anybody for
14 Freedom Rain to be considered a nonprofit?
15     A.   I don't know. I don't -- I
16 know --
17         MR. DONALDSON: If you don't
18 know, say you don't know.
19     A.   I don't know.
20     Q.   You don't recall any such
21 documents being sent to the State of Alabama?
22     A.   I don't know.
23     Q.   You don't recall signing any such

Page 176

1  documents other than the 501(c)(3) documents
2  provided to the IRS?
3      A.   I don't remember.
4          MR. TALTY: Dave, you've
5  instructed your client not to answer two
6  questions.
7          According to my notes, one was
8  instruct her not to answer questions about
9  who makes a determination as to the value of
10 in-kind gifts.
11         And the other one was a question
12 about whether or not Ms. Spahn had any
13 knowledge about any ongoing Internal Revenue
14 Service investigations.
15         If you want to -- I'll either ask
16 those questions, or if you want to hold to
17 your instruction not to answer, I just want
18 to hold this deposition open until we get a
19 ruling from the judge.
20         MR. DONALDSON: I am going to
21 instruct her not to answer questions
22 regarding whether or not there is some
23 ongoing criminal investigation.

Page 177

1          What's your other question?
2          MR. TALTY: The other one was, I
3  had asked a question about who in the Freedom
4  Rain organization made the determination as
5  to the value of in-kind gifts.
6          MR. DONALDSON: Well, go ahead
7  and answer that. I don't want to -- go ahead
8  and answer. Whatever that -- I don't -- if
9  you know, answer the question.
10     A.   It's nothing. It's no big deal.
11 Whoever is in the department and the donor.
12 There are certain guidelines acceptable to
13 Internal Revenue. There's books. It's all
14 over the Internet. You can get that. Or you
15 can -- when the donor gives, if they put a
16 value on it. If it's a car, there is another
17 form you have to fill out. I have don't do
18 any of it.
19     Q.   Who does it?
20     A.   Well, it depends on what
21 department. If it's the procurement
22 department, they would do it. If it comes in
23 the front door, then we did have it printed

45 (Pages 174 to 177)

Page 178

1  out for the people to figure it out
2  themselves. We have in-kind donation, some
3  kind of form they get.
4      Q.    And so there's no specific person
5  in each department?
6      A.    I just said.
7      Q.    You didn't mention any names.
8  I'm asking you if there was specific persons,
9  the name of a person who would do that.
10     A.    I am sure Stephanie Smith in
11 procurement; Rosie Mullin in accounting; the
12 donor, whoever that was, if they have a
13 receipt -- it's just like if you give
14 something to Goodwill, you put your value on
15 it and you get the receipt. And it's on the
16 Internet. You should have enough sense to be
17 able to go and figure out what your items are
18 worth.
19     Q.    Now, when those receipts are
20 brought in, they are brought in to the people
21 of -- like whoever is the head of procurement
22 and they sign off as to that value; is that
23 what you're saying?

Page 179

1      A.    Yes.
2      Q.    All right. Other than the
3  question about the Internal Revenue Service
4  investigation, I don't -- I don't have any
5  questions. I'll hand you back to David if
6  you have got any questions.
7          MR. DONALDSON: No questions.
8          MR. TALTY: Before I forget,
9  there's one outstanding issue on file. Yeah,
10 I just want to put on the record we're
11 holding this deposition open for a possible
12 decision by the judge regarding a question of
13 Ms. Spahn about any Internal Revenue Service
14 investigations that she may be aware of,
15 whether there are any ongoing Internal
16 invest -- Internal Revenue Service
17 investigations that she is aware of.
18         MR. DONALDSON: That's not --
19 what he just told you isn't an agreement,
20 it's just a statement he's making. And he
21 can, obviously, say anything he wants to.
22         MR. TALTY: I think -- I want to
23 get on the record. Now, you made a statement

Page 180

1  that, of course, you will come back if the
2  judge orders it, which I understand is pretty
3  obvious.
4          MR. DONALDSON: If the judge
5  orders me to, I'll stand on one foot and hop
6  up and down.
7          (Recess taken.)
8      Q.    Ms. Spahn, back when Freedom Rain
9  was formed and you started with a governing
10 board, who selected the governing board
11 members?
12     A.    When you start -- when the
13 nonprofit came over, I think Bob Prescott and
14 I made the decision on the original four or
15 five.
16     Q.    Thank you. That's it.
17     A.    But none of them are related to
18 me.
19
20          ~~ooOoo~~
21 The deposition of
22 BRENDA LOVELADY SPAHN
23 concluded at 1:45 p.m.

Page 181

1      on April 10, 2009
2          ~~ooOoo~~
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

46 (Pages 178 to 181)

Page 182

```
1          C E R T I F I C A T E
2    STATE OF ALABAMA    )
3    COUNTY OF JEFFERSON )
4         I, Deborah K. Munago, Registered
5    Professional Reporter of the State of
6    Alabama, do hereby certify there came before
7    me the aforenamed deponent, who was by me
8    duly sworn to testify to the truth concerning
9    the matters in this cause.
10        I further certify that I am neither
11   attorney or counsel for, nor related to or
12   employed by any of the parties to the action
13   in which this deposition is taken; and
14   furthermore, that I am not a relative or
15   employee of any attorney or counsel employed
16   by the parties hereto, or financially
17   interested in the action.
18        IN WITNESS WHEREOF, I have set my
19   hand this the 21st day of May, 2009.
20        ____
          Deborah K. Munago, ACCR #590
21        Court Reporter
          Notary Public
22
23   My Commission Expires: December 19, 2012.
```

47 (Page 182)